UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO: 12-0001 |
| | * | |
| VERSUS | * | SECTION: "F" |
| | * | |
| TELLY HANKTON | * | |
| | * | |

* * * * * * * * * * * * * * * * * * *

_____

**MEMORANDUM IN SUPPORT OF
MOTION FOR SANCTIONS FOR RULE 6(e) VIOLATION
AND REQUEST FOR EVIDENTIARY HEARING**

_____

MAY IT PLEASE THE COURT:

**Preamble:**

The defendant Telly Hankton is charged, *inter alia*, with four counts of death-eligible offenses involving two different – but not four – homicides.  In Count 5, Telly Hankton is charged with violating 18 U.S.C. §1959(a)(1) (racketeering) relating to the homicide of Darnell Stewart in violation of Louisiana Revised Statute 14:30.1. In Count 6, Telly Hankton is charged with violating 18 U.S.C. §924(j)(1) (drugs and guns) also relating to the homicide of Stewart as defined by 18 U.S.C. §1111.[1]  In

---

[1]It should be noted that Telly Hankton has already been convicted in state court of the second degree murder of Stewart and sentenced to life imprisonment
(continued...)

Count 8, Telly Hankton is charged with violating 18 U.S.C. §1959(a)(1) relating to the homicide of Jesse Reed in violation of La.R.Stat. 14:30.1. In Count 9, Telly Hankton is charged with violating 18 U.S.C. §924(j)(1) also relating to the homicide of Reed as defined by 18 U.S.C. §1111. In other words, two homicides, but four death-eligible offenses.

On June 19, 2013, the defendant filed a motion for limited pre-authorization discovery. (Rec. Doc. 286). Following oral argument, Magistrate Alma Chasez ordered the government to provide the Court with certain documentation for an <u>in camera</u> inspection. (Rec. Docs. 337, 339). After reviewing the documents <u>in camera</u>, Magistrate Chasez ordered the government on September 12, 2013 to furnish the defense with certain of the documents, but ruled that the defendant was not entitled "at the present time" to some of the other requested documents. (Rec. Doc. 373). This occurred five days before Judge Kurt Engelhardt issued his order granting a new trial in the Danziger case.[2] In view of this "bombshell," we then re-urged our original request for pre-authorization discovery as well as making a supplemental

---

[1](...continued)
without the benefit of parole, probation, or suspension of sentence. His conviction and sentence have been affirmed. *State v. Hankton*, 2013 La.App. Lexis 1576 (La.App. 4th Cir. 2013).

[2]See *United States v. Bowen*, No. 10-204, (Rec. Doc. 1137).

-2-

request for discovery of additional material. (Rec. Doc. 392). Some of the additional material sought related to leaks of matters occurring before the grand jury. We repeat here (with some modification) what we said in the relevant section of our memorandum in support of the Supplemental Motion. (Rec. Doc. 392-1).

**A Time to Leak:**

On October 13, 2012, five days before the return on October 18 of the instant second superseding indictment, John Simerman wrote an article for the *Times-Picayune* wherein he proclaimed, "U.S. Attorney Jim Letten's office is poised, within days or weeks, to unleash a major racketeering indictment against Hankton, at least two cousins, the alleged hit-man accused of killing Curtis Matthews on Hankton's behalf, and several others." (Rec. Doc. 392-4, p. 2). The article mentions "source" or "sources" at least twelve times, including more specific references to "law enforcement sources," "sources with knowledge of the probe," and "criminal justice source with close knowledge of the federal investigation." And many of Simerman's predictions were correct. For example, that the indictment would not include Edward Allen as a defendant although he had been charged with Telly Hankton in the state case for the Reed homicide; that the indictment would include the "perjury case related to the alibi testimony" in the first state court trial of Hankton for the Stewart homicide; that the indictment would not allege any connection between Hankton and

-3-

Brian "Baby" Williams; and, consistent with the government's theory in this case, that defendant Walter Porter was "known to fire a 9mm and a .45 caliber handgun at the same time, double-fisted...."

When the indictment predictably was returned five days later, it contained, *inter alia*, the following allegations in overt acts 18, 20 and 21:

> "18. On or about sometime between May 8, 2000, and May 22, 2000, F.H. told Telly Hankton that F.H.'s daughter, V.B., had keys to his house and that V.B. and C.F. stole Telly Hankton's drugs from F.H.'s house.
>
> * * *
>
> 20. On or about sometime in May/June 2000, Telly Hankton discussed with an associate that Telly Hankton was going to kill his cousin, V.B., for stealing his drugs.
>
> 21. On or about June 12, 2000, V.B., the daughter of F.H., and C.F., who were believed to have stolen Telly Hankton's drugs and/or money from F.H.'s house, were shot and killed."

The next day, October 19, 2012, Simerman wrote an article wherein he stated:

> "The indictment also includes a suspicion that someone in the Hankton clan killed Hankton's cousin Venice Brazley and Calvin Fox on June 12, 2000, in an ambush near a Gert Town nightclub.
>
> Hankton suspected that Brazley and Fox had stolen 'large quantities' of drugs or money from Brazley's mother's

> house, the indictment says.
>
> A month earlier, Telly Hankton had shot at Brazley's mother over the stolen goods. Then the mother told Hankton that Brazley and Fox had the keys to the house, according to the indictment, which only uses their initials." (Rec. Doc. 392-5, p. 6).

In other words, the next day's article contained names, whereas the indictment contained only initials.

Remarkably, these leaks were made after Judge Engelhardt had entrusted former First Assistant Jan Mann in June, 2012, with investigating similar leaks that had been made in the Danziger case back in 2010.

**Mea Culpa:**

Equally remarkable is the government's response to our Supplemental Motion. (Rec. Doc. 409, pp. 12-14). We repeat verbatim from the government's response:

> "**OCTOBER 13, 2012 *TIMES-PICAYUNE* ARTICLE/ OCTOBER 14, 2012 *TIMES-PICAYUNE* ARTICLE**
>
> In relation to the October 13, 2012/October 14, 2012 *Times-Picayune* Hankton Organization article, the government provides the following information. At the request of the *Times-Picayune* and upon learning that the *Times-Picayune* was going to publish an article on the Hankton Organization within days of the anticipated second superseding indictment, Federal Bureau of Investigation Supervisory Special Agent (SSA) Chip Hardgrave and Special Agent Keith Burriss met with three

*Times-Picayune* reporters, Gordon Russell, John B. Simerman, and Claire E. Napier-Galofaro. The United States Attorney's Office, including Assistant United States Attorneys Elizabeth Privitera and William J. Quinlan, Jr., were not made aware of the meeting until after it occurred. This meeting occurred at the FBI office on Leon C. Simon Boulevard on October 10, 2012. Because of the violent nature of this organization, SSA Hardgrave sought permission from former Assistant Special Agent-in-Charge Todd Cox to meet with reporters in order to determine whether the *Times-Picayune* article would jeopardize operational plans and risk the safety of federal agents by tipping off those defendants who were to be arrested. In anticipation of the upcoming second superseding indictment, FBI initiated operational plans which involved eight arrest teams and 45 federal agents. According to the FBI sign-in sheet, the three reporters were at the FBI building for only 35 minutes. *See Exhibit B.*

It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI. The article attributes a reference to 'Keyser Soze' to a law enforcement source and attributes a reference to Telly Hankton's 'nearly mythic reputation' to federal authorities. During the above listed meeting, SSA Hardgrave likened Telly Hankton to 'Keyser Soze,' and stated that Telly Hankton's mythic reputation had been earned. The *Times-Picayune* reporters arrived to the meeting with a large chart, which was printed in its October 13, 2012/October 14, 2012 article, with two alterations. The chart shown at the meeting with FBI included an incorrect photograph of Gerard Howard and a photograph of Brian Williams and others, neither of which appeared in the published final form. Special Agent Burriss informed the reporters he was not familiar with the person shown as Gerard Howard, and he inquired as to why reporters included a photograph of Brian Williams, an individual connected to Cash Money

Records.

No other meeting between *Times-Picayune* reporters and FBI agents was held before or after the October 10, 2012 meeting."

**Eureka:**

In light of the startling admissions in the government's response (Rec. Doc. 409), our allegations are no longer allegations, but rather are facts. For example:

●**FACT**: On October 10, 2012, eight days before the return of the instant indictment, reporters Gordon Russell, John Simerman, and Claire Napier-Galofaro met at the FBI office with agents Chip Hardgrave and Keith Burriss with the permission of former Assistant Special Agent-in-Charge Todd Cox. (Rec. Doc. 409, p. 13).

●**FACT**: Three days later, on October 13, an article appeared in the *Times-Picayune* written by Simerman which stated:

> "U.S. Attorney Jim Letten's office is poised, within days or weeks, to unleash a major racketeering indictment against Hankton, at least two cousins, the alleged hit-man accused of killing Curtis Matthews on Hankton's behalf, and several others. The defendants may number a dozen or more.
>
> The indictment is expected to portray a wide-ranging criminal enterprise responsible for numerous murders and brazen shootings across the city, along with armed robberies, drug crimes and possibly the perjury plot,

<u>according to sources with knowledge of the probe</u>." (Rec. Doc. 392-4, p. 2). (Emphasis added).

●**FACT:** The government has now admitted that "It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI." (Rec. Doc. 409, p. 13).

●**FACT:** The aforementioned article goes on to state:

> "The case promises to shed new light on claims that Hankton, 36, sat at the helm of a broad criminal operation, sustained by violence, that stretched from Central City to the farther reaches of Uptown.
>
> 'It's going to show the inter-relationship between the violent street crews and drug trade in this city,' said a <u>criminal justice source with close knowledge of the federal investigation</u>. 'It's going to encompass multiple neighborhoods and a vast, expansive turf.'" (Rec. Doc. 392-4, pp. 2-3). (Emphasis added).

●**FACT:** The government has now admitted that "It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI." (Rec. Doc. 409, p. 13).

●**FACT:** The aforementioned article goes on to state:

> "It doesn't appear that the feds plan to include him [Edward Allen] in the indictment." (Rec. Doc. 392-4, p. 3).

●**FACT:** The indictment in fact does not include Edward Allen as a defendant. (Rec. Doc. 73).

●**FACT:** The government has now admitted that "It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI." (Rec. Doc. 409, p. 13).

●**FACT:** The aforementioned article goes on the state:

> "Federal prosecutors also appear poised to take over the perjury case related to the alibi testimony that Danielle Hampton and Sana Johnson lent Hankton in the first Stewart murder trial, along with the attempted murder allegation against Thomas Hankton in the shooting of John Matthews." (Rec. Doc. 392-4, p. 3).

●**FACT:** The indictment in fact does include the perjury case and the attempted murder of John Matthews. (Rec. Doc. 73).

●**FACT:** The government has now admitted that "It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI." (Rec. Doc. 409, p. 13).

●**FACT:** The aforementioned articles goes on the state:

> "The federal indictment is expected to extend beyond Hankton's immediate orbit. Near the center of it is Walter Porter, an alleged hit man for Telly Hankton who grew up around Valence Street near Freret." (Rec. Doc. 392-4, p. 5).

●**FACT:** The indictment in fact names Porter as the lead defendant. (Rec. Doc. 73).

●**FACT:** The government has now admitted that "It is possible that some portions of the article may be attributed to the October 10, 2012, meeting at FBI." (Rec. Doc. 409, p. 13).

●**FACT:** At the October 10 FBI meeting, according to the government, the reporters brought with them a Hankton organizational chart which "included an incorrect photograph of Gerard Howard and a photograph of Brian Williams...." (Rec. Doc. 409, p. 13).

●**FACT:** During the October 10 meeting, according to the government, Agent Burriss informed the reporters that the photograph of Howard was incorrect, and as a result of this editorial change, the reporters deleted the photograph from the final published version of the chart. (Rec. Doc. 409, p. 13).

●**FACT:** During the October 10 meeting, Agent Burriss, according to the government, "inquired as to why reporters included a photograph of Brian Williams...," and as a result of this editorial change, the reporters deleted the photograph from the final published version of the chart. (Rec. Doc. 409, p. 13).

●**FACT:** As a result of the above, Simerman wrote in the October 13 article that "Federal officials aren't expected to make any connections to [Brian] Williams in the indictment." (Rec. Doc. 392-4, p. 8).

●**<u>FACT</u>:** The indictment in fact does not mention Brian Williams. (Rec. Doc. 73).

●**<u>FACT</u>:** The aforementioned article goes on to state:

> "Hankton was likened by <u>one law enforcement source</u> to Keyser Soze, the mythically ruthless villain from the 1995 film 'Usual Suspects.' Among the film's cast of hardened criminals, brutal stories about Soze are legion, yet the stories are all different and no one is quite sure whether the tales – or even Soze – are real.
>
> While <u>federal authorities</u> recognize that Hankton's reputation is nearly mythic, he's earned it, in their view." (Rec. Doc. 392-4, p. 10). (Emphasis added).

●**<u>FACT</u>:** The government has now admitted that at the October 10, 2012 meeting at FBI, Agent Hardgrave "likened Telly Hankton to 'Keyser Soze,' and stated that Telly Hankton's mythic reputation had been earned." (Rec. Doc. 409, p. 13).

**<u>Grand Jury Secrecy</u>:**

Rule 6(e)(2)(B) of the Federal Rules of Criminal Procedure provides:

> "Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:
> (I) a grand juror;
> (ii) an interpreter;
> (iii) a court reporter;
> (iv) an operator of a recording device;
> (v) a person who transcribes recorded testimony;

-11-

(vi) an attorney for the government; or

(vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)."

Rule 6(e)(3)(A) provides:

> "**(3) Exceptions.**
> (A) Disclosure of a grand jury matter – other than the grand jury's deliberations or any grand juror's vote – may be made to:
> (I) an attorney for the government for use in performing that attorney's duty;
> (ii) any government personnel – including those of a state, state subdivision, Indian tribe, or foreign government – that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or
> (iii) a person authorized by 18 U.S.C. §3322."

Rule 6(e)(3)(B) provides:

> "A person to whom information is disclosed under Rule 6(e)(3)(A)(ii) may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law. An attorney for the government must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule."

Rule 6(e)(7) provides:

> "A knowing violation of Rule 6, or of any guidelines jointly issued by the Attorney General and the Director of National Intelligence under Rule 6, may be punished as a contempt of court."

**The Obits:**

On November 1, 2013, the magistrate heard oral argument on our supplemental motion for pre-authorization discovery. The hearing was continued midway at our request until November 21 (Rec. Docs. 422 and 423) because Judge Engelhardt had coincidentally on that same day released to the public some 400 pages of the Danziger material that we were seeking, and time was needed to determine which documents were not included in the release order. However, during the course of the November 1 hearing, the magistrate ordered the government to disclose to the defense whether Agents Hardgrave, Burriss and former Agent Cox were included on the 6(e) list in accordance with Rule 6(e)(3)(B). The government has now disclosed to us that all three agents who were complicit in the October 10 meeting with the reporters were on the list and presumably had been advised of their "obligation of secrecy under this rule."

**The Jurisprudence:**

In *In re Grand Jury Investigation (Lance)*, 610 F.2d 202 (5th Cir. 1980), the Fifth Circuit held that a person who alleges a violation of Rule 6(e) must establish a prima facie showing of the violation in order to obtain an evidentiary hearing. The Fifth Circuit went on to hold that in determining whether a party has established a prima facie showing, a court must consider several factors. First, there must be a

-13-

clear indication that the news articles disclose information about "matters occurring before the grand jury." Second, the articles must indicate that the source of the information is one of those prohibited by Rule 6(e) from making disclosures. Third, a court must assume that all statements in the news reports are correct. Fourth, a court must consider the nature of the relief sought and the extent to which it interferes with the process of the grand jury. Lastly, a court must weigh any evidence presented by the government to rebut the otherwise prima facie showing of misconduct. We will discuss seriatim these factors as they relate to the instant case.

1. <u>Grand Jury Matters</u>:

In *Lance*, the Fifth Circuit stated:

> "We construe the secrecy provisions of Rule 6(e) to apply not only to disclosure of events which have already occurred before the grand jury, such as a witness's testimony, <u>but also to disclosures of matters which will occur</u>, such as statements which reveal the identity of persons who will be called to testify <u>or which report when the grand jury will return an indictment</u>." *Lance*, *supra*, at 216-217. (Emphasis added).

Unquestionably, the Simerman article, which correctly predicted the return of the indictment within days, satisfies this factor.

2. <u>The Source of the Information</u>:

Again, the *Lance* Court stated:

> "Disclosures which expressly identify when an indictment would be presented to the grand jury, the nature of the crimes which would be charged, and the number of persons who would be charged run afoul of the secrecy requirements codified in Rule 6(e). It is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection." *Lance*, *supra*, at 218.

The *Lance* Court explained further that:

> "Such a report raises the inference that the source of the information disclosed is the Justice Department or the attorneys conducting the grand jury investigation since they are the persons most likely to know when the presentation of evidence will be completed and when a proposed indictment might be voted upon by the grand jurors." *Ibid*.

Again, Simerman's article, correctly predicting the timing of the indictment, its nature (racketeering involving numerous murders, etc.), the names of the targeted defendants, and its attribution to "sources with knowledge of the probe," squarely fall within the scope of this factor.

  3. <u>The Correctness of the Information</u>:

As to Simerman's accuracy, in the words of Longfellow, "Thine was the prophet's vision...."

  4. <u>The Nature of the Relief</u>:

The relief sought (contempt sanctions) is specifically authorized by

Rule 6(e)(7).

    5.    <u>The Government's Evidence</u>:

In *Lance*, the Fifth Circuit reversed the district court and ordered an evidentiary hearing because, *inter alia*, there was the "absence of any affidavit by the Justice Department attorneys denying that they, their associates, or their superiors divulged the information appearing in the newspaper articles." *Id*. at 221. So too, as of now, the government lawyers here have failed to file in the discovery proceedings before the magistrate any affidavit denying their role, the role of their associates, or the role of their superiors, in the leaks.

**<u>The Need for an Evidentiary Hearing</u>:**

Although the government did not file any affidavits, it represented in its response that the "United States Attorney's Office, including Assistant United States Attorneys Elizabeth Privitera and William J. Quinlan, Jr., were not made aware of the [October 10, 2012] meeting until after it occurred." (Rec. Doc. 409, p. 13). Still unknown is when did they become aware? The next day? In any event, that unsworn assertion falls far short of what is required by *Lance*.

At the outset, it must be noted that Jim Letten and Jan Mann were the two supervising prosecutors who signed the indictment. At a minimum it would appear that *Lance* would require affidavits from them, although under the present

-16-

"unfortunate circumstances" – to use the phrase of the current prosecutors – it is unlikely that any weight would attach to such affidavits. Moreover, AUSA Maurice Landrieu, while not a signatory to the indictment, has certainly been "lurking" around this matter.

We now know that Agents Hardgrave, Burriss, and Cox are directly obligated under Rule 6(e) by virtue of a designation as such under Rule 6(e)(3)(B). Their conduct is unquestionably sanctionable, and the government's tendered excuse that the Simerman article might "jeopardize operational plans and risk the safety of federal agents by tipping off those defendants who were to be arrested" (Rec. Doc. 409, p. 13) is simply unacceptable. The short answer to that spin is that Rule 6(e)(3)(A) does not list "agent safety" as an exception to the rule. And what say the reporters, who no longer can claim any privilege given the admission by the government.

Finally, although the government asserts in its response that "no other meeting between *Times-Picayune* reporters and FBI agents was held before or after the October 10, 2012, meeting" (Rec. Doc. 409, p. 14), that unsworn assertion does not exclude telephone and email contacts.

**Conclusion:**

Under *Lance,* it is submitted that we have established a prima facie showing of a Rule 6(e) violation and therefore are entitled to an evidentiary hearing to

discover the full extent of the misconduct so that the Court may impose appropriate sanctions. In the end, and contrary to the magistrate's barb, this is not a "fishing expedition". (Rec. Doc. 411, p. 2). Indeed, these fish already have been caught and the only remaining question is whether they should be fried or baked.

Respectfully submitted:

S/Arthur A. Lemann III
Arthur A. Lemann III (#8296)
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Phone: (504) 522-8104
Email: notguiltyz@aol.com

S/D. Majeeda Snead
D. Majeeda Snead (#15052)
P. O. Box 871821
New Orleans, LA 70187
Phone: (504) 821-4747

_____
**CERTIFICATE**
_____

I hereby certify that on 8th day of November, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

S/Arthur A. Lemann III