# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  12-01** |
| **v.** | * | **SECTION:  "P"** |
| **TELLY HANKTON** | * | |
| | * * * | |

## GOVERNMENT'S OPPOSITION TO TELLY HANKTON'S MOTION
## TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

The United States of America, through the undersigned Assistant United States Attorney, hereby opposes Telly Hankton's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255. *See* Rec. Doc. 2379.

Hankton's counseled motion, filed by a member of the CJA Appellate Panel, makes inflammatory and reckless accusations against the United States Attorney's Office and the Assistant United States Attorneys who ethically and professionally prosecuted this case.[1] In so

---

[1] Suffice to say, the government does not agree with Hankton's characterization of his case as a post-Katrina witch-hunt that unfairly singled him out as a scapegoat. *See, e.g.*, Rec. Doc. 2379-1, p. 2 (describing the "media frenzy" around Hankton's case that "clearly created a pressure on the government to send 'New Orleans' Most Dangerous' away for good"); Rec. Doc. 2379-1, p. 51 ("In the years following Hurricane Katrina, local politicians and journalists latched on to Telly Hankton as the singular reason for the waves of violent crimes plaguing the city."). Nor does the government agree with Hankton's claims that it was part of a "machine" with the media or that it was in a "race to convict no matter the cost." Rec. Doc. 2379-1, p. 2. In his order denying Hankton's motion for a new trial or judgment of acquittal, Judge Feldman found multiple times that overwhelming evidence supported Hankton's convictions. *See* Rec. Doc. 1652, pp. 9-10 (rejecting Hankton's challenge to his conviction for the murder of Darvin Bessie and stating, "The jury heard all of this evidence at trial and chose to credit the eyewitness accounts, a rational choice in light of the overwhelming evidence."); Rec. Doc. 1652, pp. 11-12 ("The jury had substantial (indeed, overwhelming) evidence to rationally find Telly Hankton guilty of the murder of Jesse Reed."); Rec. Doc. 1652, p. 30 ("[Rodney] Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton."). Hankton did not challenge the sufficiency of the evidence on direct appeal. Nevertheless, the Fifth Circuit, as part of its analysis on a different issue, commented on the strength of the evidence related to the murder of Jesse Reed. *See United States v. Hankton*, 51 F.4th 578, 601 (5th Cir. 2022) ("[S]even witnesses testified that [codefendant Walter] Porter told them he killed Reed and that Telly paid him for it.").

doing, Hankton's motion invokes foundational criminal cases before then misreading and misapplying them to issues that were already resolved by Judge Feldman and the Fifth Circuit or that are otherwise plainly meritless. For these reasons, as well as the reasons below, Hankton's motion should be denied without discovery or an evidentiary hearing.

## FACTS AND PROCEDURAL HISTORY

In June 2014, a federal grand jury in the Eastern District of Louisiana charged Hankton and multiple codefendants in a 24-count superseding indictment with various crimes related to the Hankton Organization's violence and drug dealing. *See* Rec. Doc. 670.[2] In June 2016, the defendants who had not pleaded guilty proceeded to a two-week trial that included testimony from over 70 witnesses. The jury convicted the defendants on some charges and acquitted them on others. *See* Rec. Doc. 1600-1. In November 2016, Judge Feldman sentenced each of the

---

Hankton's counseled motion ignores these and other adverse findings and skips straight to accusing the government of improper motives and serious constitutional violations. As another section of this Court found in a parallel proceeding involving the criminal investigation of First NBC Bank, "[I]mpugning the motives of an adversary with no factual basis to do so is an unproductive and unprofessional tactic. Such tactics may have the unintended consequence of undermining the persuasiveness of counsel's arguments." *Aaron v. Illinois Nat'l Ins. Co.*, No. 22-9, 2022 WL 4311755, at *4 n.17 (E.D. La. Sept. 19, 2022) (Africk, J.).

[2] The government has not summarized all of the Hankton Organization's criminal conduct as part of this response. A more detailed history of the Hankton Organization was included in the government's opposition to Kevin Jackson's Motion for a Sentence Reduction, *see* Rec. Doc. 2310, and it was also part of the government's responsive brief in Hankton's Fifth Circuit appeal. *See United States v. Hankton*, Fifth Circuit Case No. 16-30995, 2021 WL 5407939 (Nov. 10, 2021).

defendants, including Hankton, to at least one term of life imprisonment. *See* Rec. Doc. 1848, p. 3 (judgment).

Over the course of the proceedings, Judge Feldman addressed claims by Hankton that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, referring to Hankton's claims in one order as "speculative and tenuous," *see* Rec. Doc. 1652, p. 26:

- First, in an order issued during Hankton's trial, Judge Feldman addressed a recorded phone conversation between witness Cherisse Gibson and her inmate brother, Nathaniel Gibson. *See* Rec. Doc. 1558, pp. 3-5. The government provided the recording to Hankton's codefendant Walter Porter but not to Hankton. *See* Rec. Doc. 1558, pp. 3-4. Judge Feldman found that the recording was "valuable impeachment evidence against Cherisse Gibson" and that the government should have provided it to Hankton as well as Porter, despite Porter's extensive use of the recording during cross-examination of Gibson. Rec. Doc. 1558, p. 4. Judge Feldman ordered the government "to immediately turn over the recorded conversation and any corresponding transcript in the government's possession," as well as "any grand jury testimony provided by Gibson in which she addresses the recorded phone conversation or anything related to this case." Rec. Doc. 1558, p. 4. Further, Judge Feldman stated that Hankton's counsel would "be permitted to recall Cherisse Gibson for additional cross-examination." Rec. Doc. 1558, pp. 4-5.

- Second, in the same order issued during trial, Judge Feldman addressed letters from witness Washington McCaskill in which McCaskill admitted to lying about purchasing drugs from Hankton's codefendant Kevin Jackson. *See* Rec. Doc. 1558, pp. 5-6. During the trial, Jackson's counsel requested the letters, and the government provided them the same day. Rec. Doc. 1558, p. 6. Judge Feldman found that the letters "largely corroborate

the information that the government had already provided [to the defense] on June 3, 2016—that McCaskill lied about purchasing drugs from Kevin Jackson." Rec. Doc. 1558, p. 6. Thus, because the defendants were in possession of the material information and were able to use it during cross-examination of other witnesses, they "suffered no prejudice from the delayed delivery of McCaskill's letters." Rec. Doc. 1558, p. 6. As Judge Feldman found, "the government timely disclosed the exculpatory information from the letters regarding the fabricated story of Kevin Jackson's drug involvement." Rec. Doc. 1558, p. 6.

- Third, in the same order issued during trial, Judge Feldman addressed a recorded phone conversation between McCaskill, witness Travis Bradley, and FBI Special Agent Keith Burriss. *See* Rec. Doc. 1558, pp. 6-7. The government produced the recording after Bradley testified. *See* Rec. Doc. 1558, pp. 6-7. Judge Feldman found that the recording "may have been useful in impeaching Bradley as to his associations with McCaskill" and allowed the defense to recall Bradley "for limited cross-examination with regard to the recently disclosed phone conversation." Rec. Doc. 1558, pp. 7-8.

- Fourth, in the same order issued during trial, Judge Feldman briefly addressed defense counsels' speculation "that the government has withheld grand jury testimony or an FBI interview of government witness Michael Anderson." *See* Rec. Doc. 1558, p. 8. Judge Feldman found that it was "unclear as to whether any such material exists" and reminded "the government of its obligation to turn over any and all relevant Jencks material in this case and . . . to do so immediately." Rec. Doc. 1558, p. 8.

- Fifth, in a post-trial order denying Hankton's motion for a new trial, Judge Feldman addressed "defense counsel's post-trial interview of Rodney Robinson, a recurring figure

4

throughout the trial." *See* Rec. Doc. 1652, pp. 26-30. As part of his post-trial statement, Robinson "prais[ed] Telly as an encouraging role model" and stated that he did not believe Hankton shot him or his associate Brian Broussard. *See* Rec. Doc. 1652, pp. 27-28. Federal agents had twice visited Robinson before Hankton's trial, but they did not generate a report of either meeting because, according to the government, "Robinson refused to talk about any of the events in the case and expressed a desire not to be involved." *See* Rec. Doc. 1652, pp. 28-29. Regardless, the government "turned over numerous discovery documents related to the Robinson and Broussard shootings, including police narratives, crime scene reports, and medical reports." Rec. Doc. 1652, p. 29. Judge Feldman rejected Hankton's argument that "Robinson would have been a 'powerful witness' for Hankton's defense," *see* Rec. Doc. 1652, p. 28, finding instead that "Hankton overstates the significance of Robinson's would-be testimony." Rec. Doc. 1652, p. 30. As Judge Feldman found, "[a]t best, it is wishful thinking that a witness like Robinson would have saved Hankton from conviction" and "Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton." Rec. Doc. 1652, p. 30.

- Finally, in the same post-trial order, Judge Feldman addressed claims concerning former NOPD Detective Desmond Pratt, who was "under investigation by the Department of Justice for fabricating evidence, coercing witnesses, and other corrupt conduct." *See* Rec. Doc. 1652, pp. 31-32. As recounted by Judge Feldman, "[i]n May of 2015, the prosecutors disclosed the DOJ investigation to the defendants, and provided specific details and FBI reports of revelations impacting this case," as well as "information on Pratt's misdeeds in other, unrelated cases." Rec. Doc. 1652, p. 31. Judge Feldman

observed that, "[a]side from Hankton's wishful thinking, nothing creates even a hint that the government withheld information regarding Pratt. To the contrary, the government discovered Pratt's misconduct and turned over detailed information of its findings over a year before trial." Rec. Doc. 1652, p. 31. Moreover, "while Pratt's misconduct was a factor in the case, Hankton has doggedly exaggerated its impact" because "[f]ew, if any, of the government's material witnesses had even heard of Pratt, although defense counsel asked every single one." Rec. Doc. 1652, p. 32. Judge Feldman concluded that "Hankton's desire for the government's entire case to unravel on a speculative conspiracy theory involving Pratt's crooked conduct is farfetched conjecture." Rec. Doc. 1652, p. 32.

On appeal, the only of Judge Feldman's *Brady* findings Hankton challenged were the findings concerning the McCaskill letters and recording. *See Hankton*, 51 F.4th at 601-03; *see also United States v. Hankton*, Fifth Circuit Case No. 16-30995, Doc. 00515254253 (Telly Hankton's opening brief), pp. 49-54.[3] The Fifth Circuit held that Hankton's *Brady* claims related to McCaskill were meritless and affirmed his convictions, except for those under § 924 that were affected by subsequent changes in the law. *See Hankton*, 51 F.4th at 603, 614. Hankton filed a petition for a writ of certiorari, which the Supreme Court denied on February 21, 2023. *See Hankton v. United States*, No. 22-6561, 143 S. Ct. 839 (Feb. 21, 2023) (table).

In November 2023, Hankton filed a motion for production of the government's "entire file" related to this case. Rec. Doc. 2330. In February 2024, this Court denied Hankton's motion

---

[3] Hankton's opening brief was filed under seal. The government will provide it upon request from the Court.

because there was no procedural basis for Hankton to make a pre-§2255 request for discovery. *See* Rec. Doc. 2375, pp. 4-5.

Hankton filed the instant § 2255 motion on February 21, 2024—within one year of the denial of his petition for a writ of certiorari, and thus his motion is timely under 28 U.S.C. § 2255(f)(1). *See United States v. Olvera*, 775 F.3d 726 (5th Cir. 2015) ("A judgment becomes final under § 2255(f)(1) when the Supreme Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.") (quotation marks omitted). In his motion, Hankton argues that (1) the government violated *Brady* with respect to certain categories of evidence, *see* Rec. Doc. 2379-1, pp. 9-24; (2) the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), by eliciting false testimony from or failing to correct testimony by certain witnesses, *see* Rec. Doc. 2379-1, pp. 24-34; (3) the government violated various constitutional obligations by failing to disclose the terms of plea agreements with certain witnesses, *see* Rec. Doc. 2379-1, pp. 34-44; (4) he is actually innocent of the murder of Darvin Bessie, *see* Rec. Doc. 2379-1, pp. 44-47; (5) he received constitutionally ineffective assistance of counsel from his two appointed attorneys, *see* Rec. Doc. 2379-1, pp. 48-51; and (6) the culmination of these "errors" requires that his sentence be vacated. *See* Rec. Doc. 2379-1, pp. 51. For the reasons below, Hankton's motion should be denied without discovery or an evidentiary hearing.

<u>**LAW AND ARGUMENT**</u>

I.     **Nearly all of Hankton's claims are procedurally defaulted.**

"Relief under § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir.

1994). A defendant "may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). "A defendant can establish 'cause' by showing that an objective impediment that is external to his defense prevented him from raising a claim on direct appeal." *United States v. Rodney*, No. 10-102, 2014 WL 6607069, at *3 (E.D. La. Nov. 18, 2014) (Lemmon, J.) (citing *United States v. Flores*, 981 F.2d 231, 235 (5th Cir. 1993)). "To show 'actual prejudice' the defendant must demonstrate not just the possibility of prejudice, 'but an actual and substantial disadvantage, infecting his entire proceedings with error of constitutional dimension.'" *Id.* (quoting *Shaid*, 937 F.2d at 233) (brackets omitted). That a claim would have been futile on direct appeal is not enough to overcome procedural default. *United States v. Scruggs*, 714 F.3d 258, 264 (5th Cir. 2013).

In its opposition to Hankton's motion for pre-§ 2255 discovery, the government stated that it would argue procedural default, particularly for any new *Brady* claims that Hankton did not raise as part of his direct appeal. *See* Rec. Doc. 2342, p. 6 n.2. Despite this advance warning, Hankton asserts several *Brady* claims that go beyond his direct appeal, and he makes no effort to establish cause or actual prejudice excusing the default. *See* Rec. Doc. 2379-1, pp. 9-24. On appeal, the only of Judge Feldman's *Brady* findings Hankton challenged were the findings concerning the McCaskill letters and recording. *See Hankton*, 51 F.4th at 601-03; *see also United States v. Hankton*, Fifth Circuit Case No. 16-30995, Doc. 00515254253, pp. 49-54. Thus, the following *Brady* claims that were not raised on direct appeal are procedurally barred, *see Murphy v. Davis*, 901 F.3d 578, 597-98 (5th Cir. 2018) (applying procedural default to *Brady* claim):

- *Brady* claims related to Cherisse Gibson, *see* Rec. Doc. 2379-1, p. 10;

- *Brady* claims related to Rodney Robinson, *see* Rec. Doc. 2379-1, pp. 11-17;

- *Brady* claims related to Desmond Pratt, *see* Rec. Doc. 2379-1, pp. 17-21; and

- *Brady* claims related to Michael Anderson. *See* Rec. Doc. 2379-1, pp. 22-22-24.

Similarly defaulted are Hankton's *Napue* claims, which he likewise did not raise on direct appeal. *See* Rec. Doc. 2379-1, pp. 24-34; *see also Rhodes v. Cain*, No. 11-0399, 2014 WL 4686809, at *10-11 (E.D. La. Sept. 19, 2014) (Berrigan, J.) (applying procedural default to *Napue* claim); *Luna v. Davis*, No. SA-15-CA-451-XR, 2018 WL 4568667, at *11 & n.5 (W.D. Tex. Sept. 24, 2018) (same). The same is true for his claims concerning cooperating witnesses' plea agreements, *see* Rec. Doc. 2379-1, pp. 34-44, and his claims concerning cumulative error. *See* Rec. Doc. 2379-1, pp. 51.

The only claims Hankton raises that are not defaulted are (1) those *Brady* claims related to the McCaskill letters and recording, *see* Rec. Doc. 2379-1, pp. 21-22; which, because the Fifth Circuit already rejected them, are foreclosed and cannot be relitigated, *see United States v. Goudeau*, 512 F. App'x 390, 393 (5th Cir. 2013) ("[W]e may not consider an issue disposed of in [the defendant's] previous appeal at the § 2255 stage."); (2) the claim of actual innocence related to the Bessie murder, *see* Rec. Doc. 2379-1, pp. 44-47; *see also Scruggs*, 714 F.3d at 265[4]; and (3) the claim of ineffective assistance of counsel. *See* Rec. Doc. 2379-1, pp. 48-51; *see also United States v. Cuff*, 79 F.4th 470, 476 (5th Cir. 2023) ("[S]ome claims can be raised for the first time in a collateral proceeding—the prime example being ineffective-assistance-of-counsel claims.").

---

[4] Actual innocence "is not a free-standing ground for relief" but is instead "a gateway to consideration of claims of constitutional error that otherwise would be barred from review." *United States v. Scruggs*, 691 F.3d 660, 671 (5th Cir. 2012). For the sake of completeness, the government responds to Hankton's actual innocence argument in a separate section below. However, this Court "need not decide whether [Hankton] is actually innocent" if it concludes that his "constitutional claims fail on the merits." *Id.* In that case, there would be "no ground for relief on the other side of the gate." *Id.*

For all other claims, Hankton has not established cause or actual prejudice as required to excuse the default. *See Shaid*, 937 F.2d at 232; *Rodney*, 2014 WL 6607069, at *3. Accordingly, those claims should be denied.[5]

## II.   Even assuming they were not procedurally defaulted, Hankton's *Brady* claims are meritless.

"Under *Brady*, the government violates a defendant's due process rights if it withholds evidence that is favorable to the accused and material to the defendant's guilt or punishment." *Hankton*, 51 F.4th at 602 (quotation marks omitted). "There are three components to a *Brady* violation." *Id.* "First, the evidence must be favorable to the accused, a standard that includes impeachment evidence." *Id.* "Second, the government must have suppressed the evidence." *Id.* at 602-03 (brackets omitted). "Third, the defendant must have been prejudiced." *Id.* at 603.

As an initial matter, Hankton's assertion that "[t]he record proves mid-trial *Brady* violations occurred" is incorrect. *See* Rec. Doc. 2379-1, p. 10. As Hankton's own direct appeal made clear, a "mid-trial *Brady* violation" is a legal impossibility. *See Hankton*, 51 F.4th at 602 ("Evidence that is turned over to the defense during trial has never been considered suppressed. Instead, when a defendant challenges the late production of impeachment evidence, the analysis turns on whether the defendant was prejudiced by the tardy disclosure.") (brackets, ellipsis, and quotation marks omitted) (emphasis omitted). Even if it were not, Judge Feldman thoroughly addressed each of Hankton's *Brady* complaints throughout the proceedings, referring to them in one order as "speculative and tenuous," *see* Rec. Doc. 1652, p. 26, and the few *Brady* claims

---

[5] For those claims that are defaulted, the Court can stop its analysis here—the default provides an independent reason to deny Hankton's claims, and analysis of the merits is unnecessary. However, to the extent it assists the Court in resolving Hankton's motion, the government responds to the merits of his claims below.

Hankton raised on appeal were rejected by the Fifth Circuit. *See Hankton*, 51 F.4th at 602-03. In other words, Hankton misapplies *Brady*, including as it has been interpreted in multiple orders and a published Fifth Circuit decision within his own case.

Turning to Hankton's individual *Brady* claims, they are meritless, and this Court should deny them:

*Rodney Robinson*

Hankton argues that the government violated *Brady* with respect to information concerning shooting victim Rodney Robinson. *See* Rec. Doc. 2379-1, pp. 11-16. At trial, witnesses testified that Hankton shot Robinson twice as part of a feud that also involved Robinson's associate Brian Broussard. *See* Rec. Doc. 1921, pp. 122-32; Rec. Doc. 1922, p. 64-77. According to Hankton, the government withheld information related to interviews of Robinson by federal and state investigators "and allowed witnesses to testify that Mr. Hankton had shot Rodney Robinson, without ever disclosing that Mr. Robinson believed he was shot in January of 2004 during a robbery and in November of 2004 by a man from a different neighborhood." Rec. Doc. 2379-1, p. 14. Robinson signed a written statement to that effect following Hankton's trial in 2016 and apparently signed a similar statement in 2024. *See* Rec. Doc. 2379-1, pp. 12-13; Rec. Doc. 2379-1, pp. 59-73 (written statements by Robinson).

As recounted by Judge Feldman, the government "turned over numerous discovery documents related to the Robinson and Broussard shootings, including police narratives, crime scene reports, and medical reports." Rec. Doc. 1652, p. 29. Additionally, although federal agents had twice visited Robinson before Hankton's trial, they did not generate a report of either meeting because, according to the government, "Robinson refused to talk about any of the events in the case and expressed a desire not to be involved." Rec. Doc. 1652, pp. 28-29. As Judge

Feldman found, "Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton." Rec. Doc. 1652, p. 30. Hankton did not appeal this finding.

That Hankton obtained a second statement from Robinson repeating his points from the first statement does not change this analysis. Although Robinson's purported belief that someone other than Hankton shot him may have been favorable to Hankton at trial, Hankton has not satisfied his burden to demonstrate the remaining two *Brady* factors: that the government possessed this information and suppressed it, and that the information would have been so material that its suppression prejudiced Hankton. *See Hankton*, 51 F.4th at 602. Among other things, Hankton has not demonstrated that the government possessed any statements by Robinson before Hankton's trial. To the contrary, after Hankton's trial, the FBI case agent who investigated this case submitted an affidavit explaining that he twice approached Robinson for an interview, and, "[w]hen we approached Robinson on each occasion, he did not provide information regarding who shot him despite offers on the second occasion of potential assistance with pending criminal charges if he were willing to cooperate." Rec. Doc. 1642-7, p. 1 (affidavit of FBI Special Agent Beau Barker); *see also* Rec. Doc. 1642, p. 5 (government's opposition to Hankton's post-trial motion for new trial, stating, "Like other witnesses the government approached during this investigation, Robinson expressed a desire not to be involved. In fact, the interactions with Robinson were so brief and uneventful, the agents did not write a report because there was no investigative value, positive or negative, to memorialize from the agents' questions of Robinson.").

Nor has Hankton demonstrated that he exercised any due diligence in attempting to obtain statements from Robinson before his trial. *See United States v. Brown*, 650 F.3d 581, 588

(5th Cir. 2011) ("[E]vidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it. To have been suppressed, the evidence must not have been discoverable through the defendant's due diligence.") (quotation marks and citations omitted). As Hankton concedes, before trial, he received medical records showing that Robinson was treated for gunshot wounds in January and November 2004, *see* Rec. Doc. 2379-1, p. 11, and he also received grand jury transcripts as part of the government's Jencks/*Giglio* productions that previewed much of the government's theory of this case. In the indictment, Overt Act 43 of the RICO conspiracy alleged that, in January 2004, Hankton shot "a known individual" along with Brian Broussard, an associate of Robinson's. *See* Rec. Doc. 670, p. 12. In Overt Act 45, Hankton was also alleged to have "shot a known individual" in November 2004. Rec. Doc. 670, p. 12. Particularly in light of the discovery and Jencks/*Giglio* productions, it should not have been difficult for Hankton to discern that these were references to Robinson and then interview him sometime before trial began.[6]

Additionally, even assuming that the government somehow suppressed Robinson's statements, Hankton has not demonstrated that the evidence was material. "For evidence to be material, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Brumfield*, 89

---

[6] Hankton argues that "[t]he likelihood that the government suppressed Mr. Robinson as a favorable witness is further corroborated by the otherwise inexplicable decision to withhold his name in the indictment and refer to him only as a 'known individual.'" Rec. Doc. 2379-1, p. 15. Hankton's claim is undermined by the fact that the government produced medical records that named Robinson as a gunshot victim and grand jury transcripts, including by case agents, that previewed much of the government's theory of this case. *See* Rec. Doc. 1642, p. 7 (government's opposition to Hankton's motion for a new trial, making this same argument). Moreover, longstanding Department of Justice policy advises against unnecessarily naming uncharged individuals in indictments. *See, e.g.*, Justice Manual § 9-11.130 ("Limitation on Naming Unindicted Co-Conspirators"). And, unlike Broussard, Robinson was still alive at the time Hankton was indicted. In a case where witnesses were murdered, the government cannot be faulted for anonymizing a living victim in a publicly available charging document.

F.4th 506, 513-14 (5th Cir. 2023) (quotation marks omitted). "A 'reasonable probability' is established when the failure to disclose the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 514 (quotation marks omitted). "[W]hen the undisclosed evidence is merely cumulative of other evidence in the record, such as when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable, it is not material." *Id.* at 514-15 (quotation marks omitted). "Nor is suppressed evidence material when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict." *Id.* (quotation marks omitted).

Here, one witness, Latoya Stewart, testified that, on the night of the January 2004 shooting, Robinson told her that Hankton shot him. Rec. Doc. 1921, p. 130. Stewart also testified that, on the night of the November 2004 shooting, she was "sitting right next to" Robinson when "Telly came out of nowhere, running with a gun, and [Robinson] saw him and he ran through the crowd. . . . [Robinson] was running, and [Robinson] ran for like a half a block before he was shot in the back." Rec. Doc. 1921, p. 131-32. When asked whether she saw Hankton with a gun when Robinson was shot, Stewart responded, "Yes." Rec. Doc. 1921, p. 132.

A second witness, Michael Anderson, testified that, on the night of the January 2004 shooting, he saw Hankton shoot Broussard and heard other gunshots before later learning that Robinson had been shot. Rec. Doc. 1922, pp. 73-74. Anderson also testified that, in 2005, Broussard and Robinson were shot at a third time by Hankton associates Terron Jackson and Jerrell Jackson. Rec. Doc. 1922, pp. 79-80; *see also* Rec. Doc. 1922, pp. 14-15 (testimony from NOPD officer about shooting).[7]

---

[7] Hankton does not dispute that this third shooting occurred or argue that it was unrelated to his feud with Broussard and Robinson. *See* Rec. Doc. 2379-1, pp. 11-16.

As Judge Feldman found, "Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton," Rec. Doc. 1652, p. 30, including this testimony from Stewart and Anderson. This is especially true considering that one of Robinson's post-trial statements repeats that Broussard "sold heroin from the front porch of Telly's aunt's house," *see* Rec. Doc. 2379-1, pp. 60-61, the central issue of the feud between Broussard, Robinson, and Hankton as the government presented it at trial. *See* Rec. Doc. 1921, pp. 125-26; Rec. Doc. 1922, pp. 64-68; *see also* Rec. Doc. 1920, pp. 61 (government's opening statement: "They defy Telly's orders to deal drugs elsewhere, resulting in this years-long beef instituted by Telly Hankton, resulting in the 2004 shooting of Brian Broussard by Telly Hankton, the 2004 shooting of Rodney Robinson by Telly Hankton, the 2005 shooting of Brian Broussard and Darnell Stewart by associates of Telly Hankton[.]").

Further, the two Robinson shootings were not the basis for substantive counts against Hankton but were instead among 101 overt acts alleged in the Count 1 RICO conspiracy. *See* Rec. Doc. 670, pp. 8-16. Other overt acts included Hankton's acquiring large amounts of cocaine for distribution, Rec. Doc. 670, pp. 12-13; Hankton's murder of Darnell Stewart after Andre Hankton hit him with a car, Rec. Doc. 670, p. 13; and the murder of Jesse Reed by Hankton, Walter Porter, and Kevin Jackson. Rec. Doc. 670, p. 14. The Robinson shootings provided helpful context for the jury, but they were far from the most important evidence supporting Hankton's conviction under Count 1. *See* Rec. Doc. 1652, p. 30 (order denying Hankton's motion for a new trial, stating, "At best, it is wishful thinking that a witness like Robinson would have saved Hankton from conviction. Two eyewitnesses, who had no apparent connection to Robinson, testified that Telly Hankton was the shooter of Darvin Besse. Hankton had a fair opportunity to impeach the eyewitness testimony. Many witnesses testified about the feud

15

between Hankton, Broussard, and Broussard's associates, Darnell Stewart and Jessie Reed. And Robinson's statements do not discredit testimony of the eyewitnesses to the Darnell Stewart and Jesse Reed homicides. Two credible, non-prisoner witnesses identified Telly Hankton as the gunman in the Darnell Stewart murder. And another eyewitness, Hasan Williams, who was later himself murdered, identified Telly Hankton with certainty as one of Jesse Reed's shooters."). In other words, even assuming Hankton could satisfy the other elements of *Brady*, there was no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Brumfield*, 89 F.4th at 513-14. Hankton's § 2255 motion should be denied.

*Desmond Pratt*

As he did before Judge Feldman, *see* Rec. Doc. 1652, pp. 31-32, Hankton argues that the government withheld information concerning former NOPD Detective Desmond Pratt, who was involved in the investigation of the murder of Jesse Reed. See Rec. Doc. 2379-1, pp. 17-21. Specifically, Hankton claims that the government suppressed information regarding a Department of Justice Civil Rights Division investigation into Pratt, *see* Rec. Doc. 2379-1, pp. 18-19, and an Orleans Parish criminal case against Pratt involving sexual misconduct with a juvenile. *See* Rec. Doc. 2379-1, pp. 19-21.

As recounted by Judge Feldman, "[i]n May of 2015, the prosecutors disclosed the DOJ investigation to the defendants, and provided specific details and FBI reports of revelations impacting this case," as well as "information on Pratt's misdeeds in other, unrelated cases." Rec. Doc. 1652, p. 31. Judge Feldman observed that, "[a]side from Hankton's wishful thinking, nothing creates even a hint that the government withheld information regarding Pratt. To the contrary, the government discovered Pratt's misconduct and turned over detailed information of

16

its findings over a year before trial." Rec. Doc. 1652, p. 31. Moreover, "while Pratt's misconduct was a factor in the case, Hankton has doggedly exaggerated its impact" because "[f]ew, if any, of the government's material witnesses had even heard of Pratt, although defense counsel asked every single one." Rec. Doc. 1652, p. 32. Judge Feldman concluded that "Hankton's desire for the government's entire case to unravel on a speculative conspiracy theory involving Pratt's crooked conduct is farfetched conjecture." Rec. Doc. 1652, p. 32.

Hankton's arguments concerning Pratt are no more persuasive now than they were when Judge Feldman rejected them in 2016. Even assuming that the information would have been favorable, Hankton has not demonstrated that the government possessed and withheld any materials from Pratt's Civil Rights Division and Orleans Parish investigations. *See United States v. Davidson*, No. 21-20240, 2022 WL 17986683, at *5 (E.D. Mich. Dec. 29, 2022) ("[T]he government cannot disclose what it does not have and cannot obtain."); *see also United States v. Cross*, No. 22-184, 2024 WL 707810, at *2-3 (E.D. La. Feb. 21, 2024) (Milazzo, J.) (denying defendant's motion to compel the government to inspect the Orleans Parish District Attorney's file for *Brady* material). Nor has Hankton established that any information concerning Pratt, even assuming it was suppressed, would have created a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Brumfield*, 89 F.4th at 513-14. As stated above, Judge Feldman found the evidence against Hankton for the Jesse Reed murder overwhelming, *see* Rec. Doc. 1652, pp. 11-12 ("The jury had substantial (indeed, overwhelming) evidence to rationally find Telly Hankton guilty of the murder of Jesse Reed."), as did the Fifth Circuit. *See Hankton*, 51 F.4th at 601 ("[S]even witnesses testified that [codefendant Walter] Porter told them he killed Reed and that Telly paid him for it."). Hankton's *Brady* claims related to Pratt are meritless, and they should be denied.

*Michael Anderson*

Hankton next argues that the government violated *Brady* by disclosing only one memorandum by law enforcement summarizing an interview of Michael Anderson, as well as multiple letters Anderson sent while in prison. *See* Rec. Doc. 2379-1, pp. 22-24. Hankton speculates that "[i]t is likely that additional material pertaining to Michael Anderson was in the possession of the government and not disclosed, in violation of *Brady* and the Jencks Act." Rec. Doc. 2379-1, p. 24.

Especially considering the witness safety issues in this case, the government went to great lengths to comply with its constitutional and discovery obligations for all witnesses, including its *Brady* and Jencks obligations for Anderson, and Hankton's mere speculation does not prove otherwise. *See United States v. Stanford*, 823 F.3d 814, 842 (5th Cir. 2016) (rejecting defendant's "pure conjecture" that additional reports or notes of witness interviews existed and stating, "Reliance on the government's assurance that it is not in possession of any *Brady* material may be sufficient when the defense makes a blanket request for favorable material in the government files.") (brackets omitted); *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir. 1999) ("[The defendant's] allegations on this matter reflect that he has no idea whether there even was an internal investigation, much less whether such an investigation revealed exculpatory facts. Such speculation does not support a *Brady* claim.").

Indeed, it appears that Hankton's argument is an improper attempt to use *Brady* and § 2255 as tools to compel discovery. *See Cross*, 2024 WL 707810, at *2 ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation."); *United States v. Hoffman*, No. 14-22, 2024 WL 983679, at *8 (E.D. La. Mar. 7, 2024) (Fallon, J.) (denying defendant's motion for postconviction discovery pursuant to *Brady* and stating, "Hoffman has

not shown that a rehashing of his trial and appellate arguments will, this time, yield a meritorious outcome. The Court cannot and will not enable a fishing expedition."); *United States v. Moore*, No. 03-0282, 2008 WL 1329607, at *1 (E.D. La. Apr. 9, 2008) (Africk, J.) ("[P]etitioner is not entitled to conduct a fishing expedition to locate possible errors.") (internal quotation marks omitted); *United States v. Taylor*, No. 2:08-0143, 2012 WL 1833904, at *1 (W.D. La. May 15, 2012) ("'Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence.'") (quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994)).

Further, Hankton does not explain how this evidence, even assuming it existed and the government suppressed it, would have been material. Anderson was cross-examined about the letters he wrote from prison and the fact that he hoped his cooperation would result in a sentence reduction. *See* Rec. Doc. 1922, pp. 142-57. In light of the overwhelming evidence against Hankton, it is unclear how any additional impeachment would have satisfied the demanding *Brady* standard. *See Brumfield*, 89 F.4th at 513-14; *see also United States v. Perry*, 35 F.4th 293, 345-46 (5th Cir. 2022) ("[E]vidence is generally not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable[.]") (quotation marks omitted). Hankton's § 2255 motion should be denied.

### Cherisse Gibson

It is unclear whether Hankton intended to raise a *Brady* claim related to the mid-trial productions of a phone call between Cherisse Gibson and her incarcerated brother and the transcript of Gibson's grand jury testimony, or whether references to Gibson are merely context for Hankton's other *Brady* claims. *See* Rec. Doc. 2379-1, pp. 10-11. Assuming Hankton seeks relief based on the Gibson call and transcript, his claims are meritless.

As Judge Feldman found in an order issued during Hankton's trial, the government provided the phone recording to Hankton's codefendant Walter Porter but not to Hankton. *See* Rec. Doc. 1558, pp. 3-4. According to Judge Feldman, the recording was "valuable impeachment evidence against Cherisse Gibson," and the government should have provided it to Hankton as well as Porter, despite Porter's extensive use of the recording during cross-examination of Gibson. Rec. Doc. 1558, p. 4. Judge Feldman ordered the government "to immediately turn over the recorded conversation and any corresponding transcript in the government's possession," as well as "any grand jury testimony provided by Gibson in which she addresses the recorded phone conversation or anything related to this case." Rec. Doc. 1558, p. 4. Further, Judge Feldman stated that Hankton's counsel would "be permitted to recall Cherisse Gibson for additional cross-examination." Rec. Doc. 1558, pp. 4-5.,

As discussed above, because the evidence was produced during Hankton's trial, it cannot have been suppressed for purposes of *Brady*. *See Hankton*, 51 F.4th at 602. Even assuming it was suppressed, it was not material, considering the overwhelming evidence against Hankton. *See Brumfield*, 89 F.4th at 513-14. Hankton's meritless *Brady* claims related to Gibson should be denied.

### *Washington McCaskill*

Finally, Hankton argues that the government withheld evidence related to witness Washington McCaskill. *See* Rec. Doc. 2379-1, pp. 21-22. The Fifth Circuit rejected Hankton's claims related to McCaskill as part of Hankton's direct appeal. *See Hankton*, 51 F.4th at 601-03. The Fifth Circuit's holding constitutes law of the case, and this Court cannot reconsider it. *See Goudeau*, 512 F. App'x at 393 ("[W]e may not consider an issue disposed of in [the defendant's] previous appeal at the § 2255 stage."); *United States v. Jones*, No. 15-174, 2020 WL 3892854, at

*4 (E.D. La. July 10, 2020) (Feldman, J.) ("The law of the case doctrine thus forecloses Jones's § 2255 challenge based on the same claims considered and rejected on direct appeal."). To the extent Hankton speculates about additional materials related to McCaskill that were not produced, *see* Rec. Doc. 2379-1, p. 22, such speculation is insufficient to satisfy the *Brady* standard. *See Stanford*, 823 F.3d at 842. Hankton's *Brady* claims are meritless, and his § 2255 motion should be denied.

## III.   Hankton's *Napue* claims are meritless.

Hankton argues that the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), by eliciting false testimony from or failing to correct testimony by certain witnesses. *See* Rec. Doc. 2379-1, pp. 24-34. "To establish a *Napue* violation, [a defendant] must prove (1) the witness testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material." *Brumfield*, 89 F.4th at 519 (quotation marks and brackets omitted).[8] "The Supreme Court has defined materiality in terms of a reasonable probability of a different outcome, which results when nondisclosure places the case in a different light so as to undermine confidence in the verdict." *Id.* (quotation marks omitted).

"[W]hen the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony." *Id.* at 520. "[C]ourts have been extremely reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can

---

[8] Hankton alleges that a *Napue* violation can occur when "the government knew *or should have known* the testimony it was offering was false and 'there is any reasonable likelihood that the false testimony affected the judgment of the jury.'" Rec. Doc. 2379-1, p. 25 (emphasis added) (quoting *United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004)). In *Brumfield*, the defendant likewise argued the "should have known" standard. *See Brumfield*, 89 F.4th at 519 n.35. In a footnote, the Fifth Circuit observed that the defendant's only support for the "should have known" standard was an unpublished case, but it opted not to decide the issue "because [the defendant] has not proven that the testimony presented was materially false." *Id.*

utilize the information, but decides, for tactical reasons, not to use such information." *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997); *see also United States v. Pedraza*, No. 21-50221, 2022 WL 4130769, at *1 (5th Cir. Sept. 12, 2022) ("'[T]he government can discharge its responsibility under *Napue* . . . to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible.'") (quoting *Beltran v. Cockrell*, 294 F.3d 730, 736 (5th Cir. 2002)) (ellipsis in original).

Hankton's various *Napue* claims are meritless, and they should be denied:

### Tilicus Irvin

Hankton argues that the government failed to correct witness Tilicus Irvin's testimony that "he had not received any benefit from cooperating in this case." *See* Rec. Doc. 2379-1, pp. 25-26. To support his claim, Hankton cites an email from one of the AUSAs on this case to an AUSA in the Middle District of Louisiana suggesting that a motion for sentence reduction be filed pursuant to Federal Rule of Criminal Procedure 35(b), *see* Rec. Doc. 2379-1, p. 124; as well as court documents from the Middle District establishing that the Rule 35(b) motion was filed and granted. *See* Rec. Doc. 2379-1, pp. 125-43.

During Hankton's trial, Irvin, a cocaine dealer with a night club in New Orleans, testified that he and his friend Isaac Skinner witnessed a murder and that, moments after the murder, Skinner was "ranting . . . kind of hysterical like, just ranting about how the dude Telly was tripping." *See* Rec. Doc. 1922, pp. 245-54.[9] Irvin testified that he thought the shooter looked familiar and that he had previously seen Hankton when Irvin purchased a firearm from him six months to a year before the murder. Rec. Doc. 1922, pp. 252-57. Irvin testified that, after the

---

[9] On cross-examination, Irvin testified that he later learned that the murder victim was Darvin Bessie. *See* Rec. Doc. 1922, pp. 266-67.

murder, he pleaded guilty to unrelated federal drug and firearm offenses in the Middle District of Louisiana and that, as part of his guilty plea, he agreed to cooperate against his coconspirators. Rec. Doc. 1922, pp. 246-47. Irvin explained that, as a result of his cooperation in the Middle District, he received a sentence reduction pursuant to a motion under U.S.S.G. § 5K1.1 to a term of imprisonment of 147 months. Rec. Doc. 1922, p. 247, 270. According to Irvin, at some point toward the end of his incarceration in the Middle District case, his name was mentioned when Skinner was giving his account of the Bessie murder to investigators. *See* Rec. Doc. 1922, pp. 257-58. Irvin testified that he was not interested in cooperating because he "was about to go home anyway," but that he ultimately agreed to provide information and testify because "it's part of [his] obligations" as a cooperating witness. Rec. Doc. 1922, p. 258. During his testimony, Irvin, who had already been released from prison by the time Hankton's trial began, agreed with the AUSA that, "by coming here today, you are honoring the plea agreement that you signed to cooperate with the government . . . [e]ven though at this point there's really no further benefit you can receive because you are already out of jail[.]" Rec. Doc. 1922, pp. 258-59.

On cross-examination by Hankton's counsel, Irvin testified that he did not know "the legal technicality" of a Rule 35(b) motion for sentence reduction, but that he understood that cooperation is "part of your agreement when you take a 5K1." Rec. Doc. 1922, p. 270. When Irvin was asked, "[D]o you know whether your lawyer worked on getting you a benefit, getting you out of prison early in exchange for you appearing before the federal grand jury in this case prior to the completion of your case[,]" Irvin responded, "I don't have a lawyer." Rec. Doc. 1922, p. 271. When Irvin was asked, "Was an exception made that you could come home early before your cooperation was complete in this case[,]" Irvin replied, "No, no, no." Rec. Doc. 1922, p. 271. Irvin and Hankton's counsel then had the following exchange:

| [Counsel]: | Have you ever seen the motion to reduce your sentence in your case in the Middle District? |
|---|---|
| [Irvin]: | No, ma'am. |
| [Counsel]: | You have never seen that motion. So you don't know whether this case factors significantly into that motion? |
| [Irvin]: | I don't understand what you are saying. |
| [Counsel]: | I'm asking whether your cooperation in this case factored significantly into your judge's decision to free you? |
| [Irvin]: | Well, I mean, I was due to come home anyway, so I didn't—I was going home in October. So, I mean, like I say, I didn't want to mess with this. |
| [Counsel]: | You didn't want to mess with this, and yet you are here? |
| [Irvin]: | It's my obligation. I'm supposed to. |
| [Counsel]: | Because this case factored into the agreement that made you come home early? |
| [Irvin]: | No, because everything I have done to get that sentence that I had got was the 147 months, I could have lost that. |
| [Counsel]: | I'm sorry. You could have lost— |
| [Irvin]: | By not, you know . . . |
| [Counsel]: | I'm sorry, you could have lost— |
| [Irvin]: | As far as, like, 5K1 agreements or whatever, like that's my duties. |
| [Counsel]: | It's your duty so you can come home early, right? |
| [Irvin]: | That's why I cooperated from the start. |

Rec. Doc. 1922, pp. 273-74.

None of this testimony was false or material. At most, it showed that Irvin misunderstood the distinction between the § 5K motion he received at his sentencing in the Middle District and the Rule 35(b) motion he received as a result of his cooperation in this case. *See United States v. Watts*, 823 F. App'x 255, 257 (5th Cir. 2020) (rejecting defendant's *Napue* claims related to cooperating witnesses' plea agreements and stating, "There is nothing to indicate that Landry's and Debrah's omissions were done 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'") (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Moreover, Hankton fails to mention that the government provided him with its email to the Western District AUSA and the filings related to Irvin's sentence reduction before Hankton's trial. Thus, the government satisfied any duty it had under *Napue*. *See Pedraza*, 2022 WL 4130769, at *1 ("'[T]he government can discharge its responsibility under *Napue* . . . to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible.'") (quoting *Beltran*, 294 F.3d at 736) (ellipsis in original). And, much of the complained-of testimony occurred while Irvin was being cross-examined by Hankton's counsel, meaning that "no material falsehood has occurred because the government has not itself knowingly presented false testimony." *See Brumfield*, 89 F.4th at 520. Hankton's *Napue* claim related to Tilicuis Irvin is meritless, and it should be denied.

### *"Oakdale Foursome"*

Hankton next presents a grab-bag of assorted *Napue* allegations involving cooperating witnesses Demond Butler, Isaac Skinner, Travis Bradley, and Tilicuis Irvin, whom he refers to as the "Oakdale foursome" because at some point they were incarcerated at FCI Oakdale. *See* Rec.

Doc. 2379-1, pp. 27-32. These claims range from Butler's, Skinner's, and Irvin's allegedly exaggerating their ties to the New Orleans area and their familiarity with Hankton, *see* Rec. Doc. 2379-1, pp. 31-32, to yet another rehashing of the same McCaskill claims that were addressed by the Fifth Circuit. *See* Rec. Doc. 2379-1, pp. 28-29; *see also Hankton*, 51 F.4th at 603-04. Hankton makes no real effort to show that the government knew about most of the information underlying these *Napue* claims. Instead, he argues that, "[w]ith the most minimal diligence, the government could have quickly seen that all the stories told by the Oakdale foursome were blatant fabrications." Rec. Doc. 2379-1, p. 32.

As noted above, the Fifth Circuit has questioned whether the "should have known" standard is actually what the law requires for a *Napue* violation. *See Brumfield*, 89 F.4th at 519 n.35. Indeed, binding Fifth Circuit precedent requires defendants to show that "the government knew the testimony was false," *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002), which tracks with the language in *Napue* itself. *See Napue*, 360 U.S. at 265 ("The question presented is whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States."); *id.* at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").[10] Accordingly, to the extent Hankton relies on information the government "should have known," his claims must fail.

---

[10] In addition to going beyond what *Napue* requires, the "should have known" standard would be bad policy. It would require the government to exhaustively investigate each of its witnesses, including non-incarcerated civilians, and maintain an extensive database on the types of trivial biographical information Hankton quibbles with in his § 2255 motion.

Hankton's use of an incorrect standard aside, none of his nitpicking with the witnesses' testimonies establishes a *Napue* violation. For example, Hankton references (without citation) testimony from Butler that he was introduced to Hankton through a friend named Tywan Collins. *See* Rec. Doc. 2379-1, p. 28. The government assumes that Hankton refers to Butler's testimony that, sometime after he stopped purchasing cocaine from Hankton's codefendant Kevin Jackson, he was introduced to Hankton so he could "buy nine ounces, so half a brick from him, whatever he can get":

| | | |
|---|---|---|
| [AUSA]: | [A]t some point are you put into contact to meet Telly Hankton? | |
| [Butler]: | Yes, ma'am. | |
| [AUSA]: | Now, how is it that you first came to meet Telly Hankton? | |
| [Butler]: | A friend of mine that live in Hammond. | |
| [AUSA]: | And can you tell us who that friend is? | |
| [Butler]: | His name was Taiwan Collins. | |
| [AUSA]: | Again, kind of set up for us. How do you and Taiwan get to start talking about Telly Hankton? | |
| [Butler]: | Well, Taiwan was just released from prison at the end of 2005, like, in November or December. And he seen me one day and he asked me do I need any drugs, he got a new contact. And I told him, Sure, I always need drugs. And I just told him, I'll buy nine ounces, so half a brick from him, whatever he can get. But that night—later on that night he pulled up in my yard. | |
| [AUSA]: | When you say, "he," who are you referring to? | |
| [Butler]: | Taiwan Collins. | |
| [AUSA]: | Okay. | |

| | | |
|---|---|---|
| [Butler]: | | He pulled up in my yard and he had an individual in the car with him. And when I got in the car, it was Telly Hankton. |
| [AUSA]: | | And how did you know that it was Telly Hankton? |
| [Butler]: | | Well, like, a few days later I learned that it was him. At the moment I didn't know it was him. I didn't know him at that time. |

Rec. Doc. 1881, pp. 144-45. Butler testified that he continued purchasing cocaine from Hankton an additional three or four times after this interaction. Rec. Doc. 1881, pp. 149-50.

Hankton claims that this testimony constituted a *Napue* violation because his counsel, presumably while preparing the instant § 2255 motion, called Collins, who allegedly stated that he did not know Hankton and did not want to be involved in this case. *See* Rec. Doc. 2379-1, p. 28 & n.5. Hankton does not attach a transcript or a recording of this call, so there is no way to verify that Collins's statements were as definitive as Hankton portrays them. Nevertheless, even assuming Collins would have testified that he did not know Hankton, it would fall far short of a *Napue* violation. For one thing, Hankton fails to mention that, before trial, the government provided a report of an interview with Butler dated April 25, 2014, in which Butler recounted the same interaction with Hankton after they were introduced to each other by Collins.[11] Hankton does not explain why, after he was given a preview of Butler's supposedly perjured testimony, he did nothing to address it, including during cross-examination of Butler.

Further, Hankton used nicknames and aliases, so it is possible that, on a phone call with an unknown lawyer eighteen years after these interactions occurred, Collins remembered Hankton not as "Telly Hankton" but instead as "Red," "Third," or "Wild." *See* Rec. Doc. 670 (indictment charging Hankton with those aliases); Rec. Doc. 1881, p. 28 (Hankton's source of

---

[11] The government will provide a copy of this report upon request from the Court.

supply in Texas testifying that he "didn't know him by Telly Hankton, I only know him by Third"). It is also possible that Collins was simply lying and that he did not want to admit to a stranger that he was part of a drug-trafficking conspiracy. In a case where witnesses were killed and Hankton convinced others to provide a false alibi for him for the Darnell Stewart murder, resulting in a hung jury in a state trial, *see* Rec. Doc. 1884, pp. 60-77 (testimony from Danielle Hampton that she falsely testified that she was with Hankton the day of the murder), Hankton's years-after-the-fact phone call with Collins does not establish a *Napue* violation. Among other things, it does not show that Butler acted "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," *see Watts*, 823 F. App'x at 257, or that the government knowingly suborned perjury. It also is not material considering the numerous witnesses who testified that Hankton was a drug dealer, including his source of supply. *See* Rec. Doc. 1881, pp. 22-30.

Hankton's remaining claims about the "Oakdale foursome" are similarly meritless. Hankton argues that the government violated *Napue* by failing to correct Travis Bradley's testimony that Washington McCaskill was "some dude I met in jail . . . he don't interact with me. He just try to bully and strong arm people." Rec. Doc. 2379-1, p. 28; *see also* Rec. Doc. 1881, p. 73 (Bradley's testimony). Hankton asserts that this testimony violated *Napue* because "the government was in possession of a recorded jail call in which Mr. Bradley phoned FBI Agent Burriss and put Mr. McCaskill on the phone so that Mr. McCaskill could falsely claim that he had bought drugs from Mr. Hankton's co-defendant, Kevin Jackson." Rec. Doc. 2379-1, p. 28. The Fifth Circuit rejected Hankton's argument that production of this call during trial violated *Brady* "because the district court allowed counsel to recall Bradley for limited cross-examination" and because "McCaskill's letters, phone transcript, and prior state court testimony

were all introduced into evidence for the jury to consider." *Hankton*, 51 F.4th at 603. For the same reasons, and because Hankton has not demonstrated materiality, Bradley's testimony did not violate *Napue*. *See Pedraza*, 2022 WL 4130769, at *1.

Hankton also argues that, "[w]hen Mr. Bradley and Mr. Skinner were asked whether they had ever discussed their testimony with each other, they were adamant that this had not occurred." Rec. Doc. 2379-1, p. 29. Hankton claims that "Washington McCaskill further told the government that Travis Bradley and Isaac Skinner were in the Tangipahoa Parish prison counseling others to lie to receive sentencing reductions" and that "McCaskill has since executed a statement in which he confirmed that he witnessed Mr. Bradley and Mr. Skinner using contraband phones to learn details of cases." Rec. Doc. 2379-1, p. 29.

Hankton provides no citations and does not specify whether he is referring to Bradley's and Skinner's testimonies on direct or cross-examination. Bradley was asked about Skinner exclusively on cross-examination. Rec. Doc. 1881, pp. 79, 83, 96, 104-05, 111-12. It was Hankton's counsel and not the government who asked Bradley, "Have you and Isaac Skinner talked about this case[,]" to which Bradley responded, "No." Rec. Doc. 1881, p. 111. Likewise, Skinner was asked about Bradley first on cross-examination, *see* Rec. Doc. 1922, pp. 225-33, and once on redirect examination. *See* Rec. Doc. 1922, p. 238 ([AUSA]: "What benefit, if any, would you receive if, for instance, Mr. Bradley were to come in here and provide testimony against Kevin Jackson?" [Skinner]: "None."). To the extent Hankton complains about these statements made during cross-examination, they cannot form the basis of a *Napue* violation. *See Brumfield*, 89 F.4th at 520.

In their direct examinations, Bradley and Skinner each denied, without mentioning the other, that they told McCaskill to lie about Kevin Jackson, which McCaskill had accused them of

doing while they were incarcerated at Oakdale. *See* Rec. Doc. 1881, pp. 73-74 (Bradley); Rec. Doc. 1922, pp. 197-98 (Skinner).[12] With his references to whether Bradley and Skinner "ever discussed their testimony with each other," Hankton does not appear to challenge these statements. However, to the extent he does, they also were not *Napue* violations because Hankton has not shown that they were false or that they were material considering the overwhelming evidence against him. *See Brumfield*, 89 F.4th at 519.

Hankton next alleges *Napue* violations based on statements he recently obtained from McCaskill and Raymond Frith, a supposed witness to the Darvin Bessie murder. *See* Rec. Doc. 2379-1, pp. 29-31. Hankton claims that inconsistencies in Irvin's and Skinner's testimonies, considered with McCaskill's and Frith's statements, show that Irvin and Skinner lied when they testified that they saw Hankton shoot Bessie. *See* Rec. Doc. 2379-1, pp. 29-31. As discussed below in the section concerning Hankton's claims of actual innocence for the Bessie murder, Frith's February 2024 statement does not undermine Irvin's and Skinner's testimonies because, by his own admission, Frith was inside a store during the shooting and was remembering what other unidentified people claimed to have seen. *See* Rec. Doc. 2379-1, p. 74. Additionally, as explained below, neither Irvin nor Skinner testified that they were well-known in the area or that they knew everyone there, so McCaskill's and Frith's statements that they did not recognize Irvin and Skinner from the area fail to refute their testimonies. More relevant for *Napue*

---

[12] McCaskill is a recurring figure in gang prosecutions in the Eastern District of Louisiana. In the 39ers prosecution before Judge Zainey, McCaskill similarly submitted a letter to an Orleans Parish Assistant District Attorney who was working on a related state case in which he stated, "Our federal case [involving the 39ers gang] is all made up lies[.] Darryl Franklin and Rabbit lied about a lot of things[.] You think anyone care[.] No because their prejudice toward us." *See United States v. Perry*, 35 F.4th 293, 345-47 (5th Cir. 2022) (describing McCaskill's letter and affirming Judge Zainey's denial of defendants' motions for new trial); *see also United States v. Perry*, Fifth Cir. No. 17-30610, Doc. 00515830954, p. 119 (government's responsive brief in 39ers appeal, describing instances when McCaskill lied to federal agents and obstructed justice, including by killing a witness to prevent the witness from speaking to authorities about the murder of a two-year-old).

purposes, much of the testimony Hankton references but fails to cite appears to be from Irvin's and Skinner's cross-examinations, and Hankton has failed to demonstrate that the government knowingly suborned perjury or that any statements, even assuming they were false, were material. *See Brumfield*, 89 F.4th at 519-20.[13] Hankton's claims concerning the "Oakdale foursome" plainly fail to satisfy *Napue*, and they should be denied.

*Michael Anderson and Latoya Stewart*

Hankton's final *Napue* claims involve testimony by Michael Anderson that he gave Hankton a cell phone while they were both incarcerated that Hankton used to order the killing of a witness, Rec. Doc. 2379-1, pp. 32-33, and testimony from Anderson and Latoya Stewart that Hankton claims violated *Napue* because it was inconsistent with post-trial statements by Rodney Robinson. *See* Rec. Doc. 2379-1, pp. 33-34. Again, Hankton does not cite any specific portions of the trial transcript or clarify whether he is challenging Anderson's and Stewart's testimonies on direct or cross-examination.[14]

---

[13] For example, Hankton complains about Skinner's testimony concerning the "Gotti Boys," three brothers who were part of a group that rode motorcycles. *See* Rec. Doc. 2379-1, p. 31. The term "Gotti Boys" was used only during Skinner's cross-examination by Hankton's counsel. *See* Rec. Doc. 1922, pp. 215-16. Skinner testified that he knew that the Gotti Boys were "three brothers" who were "selling drugs together," and he remembered that they were nicknamed "Wop, Pluck, and T," but he stated that he did not "really know their real names" and that "[a] lot of different guys" rode motorcycles with them. Rec. Doc. 1922, pp. 215-16. As part of his § 2255 motion, Hankton attached a February 2024 statement by Dwayne Carter, supposedly one of the Gotti Boys, who claims that Hankton "did not ride motorcycles with us" and that he does not know Skinner. Rec. Doc. 2379-1, pp. 76-77. Even assuming Carter's unvetted statement is true, it does not show that Skinner's testimony on cross-examination was untrue, and it cannot support a finding of a Napue violation. *See Brumfield*, 89 F.4th at 519-20.

[14] Throughout this *Napue* section of the government's response, the government has noted with frustration Hankton's failure to provide citations for the portions of the trial transcript he is challenging. Responding to these claims has been frustratingly time-consuming because it has required scouring substantial portions of the trial transcript to discern which statements apply to which of Hankton's claims and whether they were made on direct or cross-examination. Doubly frustrating is the fact that Hankton alleges serious constitutional violations by experienced and respected prosecutors in a high-profile case. The least his counseled motion could do is identify which pages in the transcript he believes contain examples of the government's knowingly eliciting false testimony from witnesses.

Contrary to Hankton's summary of Anderson's testimony, Anderson did not testify "that he let Mr. Hankton borrow a contraband cell phone, which Mr. Hankton then allegedly used directly in front of Mr. Anderson and called in a hit on" a witness. *See* Rec. Doc. 2379-1, pp. 32-33. Instead, Anderson testified that Hankton asked him to relay a message to Hankton associate Derrick "Dump" Smothers to "go on the W"—in other words, to "kill a witness, like go and get rid of him." Rec. Doc. 1922, p. 84; *see also* Rec. Doc. 1922, p. 84 ([AUSA]: "[Hankton] told you to pass on a message to Dump?" [Anderson]: "Told me to tell Dump to tell Squirt [that Hankton] said—you know, Telly said tell Dump, tell Squirt, he said, go on the W.").

Regardless of who used the phone, Hankton claims that this testimony was false because he "was kept under 24-hour security on a tier by himself in the House of Detention" and thus could not have spoken to Anderson. *See* Rec. Doc. 2379-1, p. 33. This explanation that Hankton never caused the text message about "the W" to be sent is contradicted by Danielle Hampton's testimony that she was part of a scheme to concoct a fake alibi for Hankton, stating, that, on the night of the murder, she and Hankton "hooked up . . . and went to the W Hotel to have drinks." Rec. Doc. 1884, p. 63. Moreover, even assuming Hankton was "on a tier by himself" and unable to speak with Anderson, that is information that was known to Hankton, and he could have cross-examined Anderson about it. For that reason, and because any statement, assuming it was false, was not material, Hankton has not demonstrated a *Napue* violation with respect to Anderson's testimony concerning the contraband cell phone. *See Pedraza*, 2022 WL 4130769, at *1.

Hankton likewise has failed to establish a Napue violation related to Robinson's post-trial statements. As explained above, Robinson's post-trial statements do not cast doubt on Hankton's conviction for the Count 1 RICO conspiracy, and they do not mean that Andersons's and Stewart's testimonies were false. As with Hankton's other *Napue* claims, his arguments

concerning Robinson's post-trial statements are meritless, and they should be denied. *See Brumfield*, 89 F.4th at 519-20.

## IV. Hankton's claims related to cooperating witnesses' plea agreements are meritless.

Hankton makes the novel argument that, because multiple cooperating witnesses received sentence reductions before or after they testified at Hankton's trial, there must have been an undisclosed secret deal between the government and the witnesses "to testify falsely to secure Mr. Hankton's convictions." Rec. Doc. 2379-1, pp. 34-43. As Hankton concedes, the government provided him with the witnesses' plea agreements in which the government agreed to bring the witnesses' cooperation to the attention of their sentencing judges and, if the government determined that the witnesses provided substantial assistance, file motions for sentence reductions under U.S.S.G. § 5K1.1 or Federal Rule of Criminal Procedure 35(b). *See* Rec. Doc. 2379-1, p. 37.

Consistent with their plea agreements, the witnesses testified that they understood that there were no promises when it came to potential sentence reductions. For example, Michael Anderson testified multiple times that he "hoped" his testimony would result in a shorter sentence, including during this exchange with counsel for Walter Porter:

| [Counsel]: | Now, part of that [plea] agreement was to cooperate, was it not? |
| [Anderson]: | Yes, sir. |
| [Counsel]: | That's why you're here? |
| [Anderson]: | Yes, sir. |
| [Counsel]: | For two reasons: one to get your sentence reduced, correct? |
| [Anderson]: | Tell the truth. |

| [Counsel]: | No, to get your sentence reduced? |
|---|---|
| [Anderson]: | And tell the truth. |
| [Counsel]: | And the second part was that in order for them to offer that deal, you had to agree to interviews requested by the U.S. attorney or law enforcement? |
| [Anderson]: | Yes, sir. |
| [Counsel]: | Correct? So in order to get your sentence reduced . . . the more times you cooperate, the more likely there is that your sentence will be reduced further, correct? |
| [Anderson]: | No, sir. It's nothing promised. |
| [Counsel]: | Pardon me? |
| [Judge Feldman]: | Nothing promised. |
| [Anderson]: | It's nothing promised. |
| [Counsel]: | Nothing promised, okay. But that's what you expect? |
| [Anderson]: | That's what I hope. |

Rec. Doc. 1922, pp. 166-67.

To support his argument that there was more to the witnesses' cooperation than what they all testified to under oath, Hankton cites general caselaw concerning the government's constitutional and discovery obligations before making the leap to speculating that the government and the witnesses had a secret deal. *See* Rec. Doc. 1922, pp. 166-67. Notably, Hankton does not cite any case with similar facts where such a finding has been made, despite the ubiquity of such testimony and sentence reductions across the federal system. Hankton's mere speculation that the government somehow committed misconduct with respect to its cooperating witnesses is insufficient to establish a claim for relief under § 2255. *See United*

*States v. Effron*, No. 08-71, 2013 WL 56135, at *4 (E.D. La. Jan. 3, 2012) (Feldman, J.) ("The Fifth Circuit has repeatedly stated that 'speculative and conclusory allegations' are insufficient to raise a constitutional issue.") (quoting *United States v. Hall*, 455 F.3d 508, 522 (5th Cir. 2006)); *see also United States v. Edwards*, 442 F.3d 258, 266 (5th Cir. 2006) ("Our review of the record leaves us with the firm conviction that there was no clandestine, collateral plea agreement protecting Guidry from state financial liability. Appellants' contentions are speculative and find no support in . . . the record on appeal."). His claims related to the witnesses' plea agreements are meritless, and they should be denied.

## V. Hankton has not demonstrated his actual innocence for the murder of Darvin Bessie.

Hankton argues that he is actually innocent of the murder of Darvin Bessie, for which he was convicted and received life sentences under Counts 5 and 6. *See* Rec. Doc. 2379-1, pp. 44-47. According to Hankton, he is actually innocent because the two witnesses who saw Hankton shoot Bessie, Tilicuis Irvin and Isaac Skinner, gave testimony that was supposedly contradicted by Raymond Frith, and because Frith and Washington McCaskill "deny knowing either Mr. Irvin or Mr. Skinner from the neighborhood, making it completely improbable that they would have happened upon a murder that they did not disclose to authorities until eight years later[.]" Rec. Doc. 2379-1, p. 44.[15]

---

[15] At points in his motion, Hankton claims that Irvin and Skinner were the only witnesses to the Bessie murder, *see, e.g.*, Rec. Doc. 2379-1, p. 34, while at others he argues that Irvin's and Skinner's testimonies were the only evidence supporting the murder at all. *See* Rec. Doc. 2379-1, p. 44. In fact, the jury heard testimony that Bessie was part of the feud between Hankton and Darnell Stewart and that, the day before Hankton murdered Bessie, Bessie (also known as D-Rock) had shot and killed Hankton associate Terron Jackson. *See* Rec. Doc. 1921, pp. 139-40; Rec. Doc. 1922, pp. 94, 173. The jury was free to draw reasonable inferences from this testimony along with Irvin's and Skinner's. *See United States v. Porras-Burciaga*, 450 F. App'x 339, 340 (5th Cir. 2011) ("The government may prove its case by direct or circumstantial evidence, and the jury is free to choose among reasonable constructions of the evidence.").

Describing the applicable law, Hankton asserts that "[t]he Courts of Appeals are divided on the correct resolution of this 'difficult question'" before citing out-of-circuit authority and suggesting that this Court may treat his actual innocence argument as a freestanding basis for habeas relief. *See* Rec. Doc. 2379-1, pp. 44-47. Again, Hankton misapplies the law.

There is no ambiguity in the Fifth Circuit concerning how courts should treat claims of actual innocence or what is required of petitioners to prove it. As noted above, binding Fifth Circuit authority states that actual innocence "is not a free-standing ground for relief" but is instead "a gateway to consideration of claims of constitutional error that otherwise would be barred from review." *Scruggs*, 691 F.3d at 671. Habeas litigants are "without any presumption of innocence." *Cruz-Garcia v. Lumpkin*, No. 17-cv-3621, 2023 WL 6221444, at *49 (S.D. Tex. Sept. 25, 2023) (citing *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005)). "A convicted defendant invoking federal habeas jurisdiction 'comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 326 (1995)). "The Supreme Court has commented that 'tenable actual-innocence gateway pleas are rare.'" *Id.* (quoting *McQuiggan v. Perkins*, 569 U.S. 383, 386 (2013)).

"[A]ctual innocence means factual innocence[.]" *Bousley v. United States*, 523 U.S. 614, 623 (1998). "A reviewing court may not find actual innocence by 'usurp[ing] the jury's function by considering the same evidence the jury did' and arriving at a different result." *Cruz-Garcia*, 2023 WL 6221444, at *49 (quoting *United States v. Vargas-Soto*, 35 F.4th 979, 999 (5th Cir. 2022)). "A petitioner arguing actual innocence must rely on 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Id.* (quoting *Schlup*, 513 U.S. at 327).

"The Fifth Circuit places strict requirements on what kind of evidence may support a valid actual-innocence argument." *Id.* "A petitioner's 'newly discovered evidence' must meet certain conditions: '(1) the evidence is newly discovered and was unknown to the defendant at the time of the trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial.'" *Id.* (quoting *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996)); *see also Pierre v. Vannoy*, No. 16-1336, 2016 WL 9024952, at *12 (E.D. La. Oct. 31, 2016) (Wilkinson, M.J.) (applying same factors and stating, "[T]he Fifth Circuit has also applied the *Berry* rule in cases alleging that newly discovered evidence justified habeas corpus relief[.]").

Viewed against this backdrop, neither Hankton's newly discovered evidence (the post-trial statements by McCaskill and Raymond Frith) nor his criticisms of Irvin's and Skinner's testimonies establishes his actual innocence for the Bessie murder. Irvin and Skinner testified that they had just arrived in a car when they saw Hankton shoot Bessie. *See* Rec. Doc. 1922, pp. 250-53; Rec. Doc. 1922, p. 202, 205-06 (Skinner). After they witnessed the murder, they panicked and drove away. *See* Rec. Doc. 1922, pp. 253-54; Rec. Doc. 1922, pp. 207-08. When asked, "Did you go to the police and report what you had seen[,]" Skinner responded that he did not "[b]ecause I had just witnessed [Hankton] kill a man. I didn't want to be next." Rec. Doc. 1922, p. 208.

In his February 2024 statement, Frith did not state that he saw someone else shoot Bessie. *See* Rec. Doc. 2379-1, pp. 74-75. Instead, he stated that he was inside a store when he heard gunshots, and, when he came out after the shooting was over, he heard other people say that the shooter had been wearing a black mask and that he drove away in a white Mitsubishi car. Rec.

Doc. 2379-1, p. 74. Thus, the most that Frith offered was a secondhand account of what other unnamed people claimed they saw. Such a statement is not material, and Hankton has not demonstrated that it "would probably produce acquittal at a new trial." *See Cruz-Garcia*, 2023 WL 6221444, at *49.

McCaskill's and Frith's statements that they did not know Irvin or Skinner "from the neighborhood" likewise do not establish Hankton's actual innocence for the Bessie murder. *See* Rec. Doc. 2379-1, pp. 44, 75. Irvin testified that he was from Gonzales, Louisiana, and, during the time period when the Hankton organization was active, he was a drug dealer and owner of a nightclub on Bourbon Street. *See* Rec. Doc. 1922, pp. 244-45. Irvin testified that he met Skinner "[a]t a nightclub right here downtown," and that he had come to New Orleans the day of Bessie's murder "to visit a lady friend." Rec. Doc. 1922, pp. 248-49. The reason they were in the area of the shooting was to buy marijuana from a dealer who apparently also knew Frith. *See* Rec. Doc. 1922, p. 249-50; *see also* Rec. Doc. 2379-1, p. 75.

Skinner's testimony was not inconsistent. He explained that he was from the Seventh Ward, while Irvin was "from Gonzales, but he's back and forth. He have a lot of businesses down in New Orleans." Rec. Doc. 1922, pp. 196, 200. Similar to Irvin, Skinner testified that the reason they were in the area of the shooting was to buy marijuana from a dealer he had only met "one other time." Rec. Doc. 1922, pp. 201-02. Neither witness testified that they frequented the area or that they knew everyone there. Any value that could be gleaned from McCaskill's and Frith's statements was minimal, and it was far short of the demanding requirements for a new trial or a showing of actual innocence. *See Cruz-Garcia*, 2023 WL 6221444, at *49. Among other things, Hankton has not shown that he exercised any diligence in obtaining McCaskill's and Frith's statements before trial, and he has not shown that their statements would be material,

as opposed to merely cumulative or impeaching. *See id.* As a result, Hankton's claim of actual innocence should be denied.

## VI.    Hankton has not demonstrated constitutional ineffective assistance of counsel.

Hankton also claims that his trial attorneys were constitutionally ineffective for failing to investigate and call Robinson and Frith. *See* Rec. Doc. 2379-1, pp. 48-51. "Under *Strickland v. Washington*, to establish an ineffective assistance of counsel claim, a petitioner must show both that his counsel's performance was constitutionally deficient and also that he suffered prejudice as a result of the deficiency." *United States v. Henry*, No. 08-19, 2010 WL 2998888, at *3 (E.D. La. July 28, 2010) (Vance, J.) (citing *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984)). "If the Court finds that the petitioner has made an insufficient showing as to either prong, it may dispose of the claim without addressing the other prong." *Id.* (citing *Strickland*, 466 U.S. at 697; *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999)). "It does not matter for Sixth Amendment purposes whether counsel was retained or appointed." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980)).

"With respect to *Strickland*'s 'deficiency' prong, the Fifth Circuit has held that trial counsel's performance must be judged against 'an objective standard of reasonableness, mindful of the strong presumption of adequacy.'" *Id.* (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). "Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention, but a conscious and informed decision on trial tactics and strategy will not be considered deficient unless it is so ill chosen that it permeated the entire trial with obvious unfairness." *Id.* (quoting *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003*); Martinez v. Dretke*, 404 F.3d 878, 885 (5th Cir. 2005)) quotation marks omitted). "In evaluating counsel's performance, the district court should make every effort to eliminate the

distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time of trial." *Id.* (citing *Jones v. Jones*, 163 F.3d 285, 300-01 (5th Cir. 1998)).

"With respect to *Strickland*'s 'prejudice' prong, the petitioner must show that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at *4 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Id.*

The Fifth Circuit has observed that, "while a lawyer's failure to investigate a witness who has been identified as crucial may indicate an inadequate investigation, the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir. 1983). Further, "a movant's claim that his counsel provided ineffective assistance when he failed to call a witness is 'not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.'" *Delgado v. United States*, No. EP-13-CR-370-DCG-1, 2023 WL 2994128, at *3 (W.D. Tex. Apr. 18, 2023) (quoting *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010)). Before a defendant can demonstrate deficient performance, he must overcome both the "strong presumption that 'conduct [fell] within the wide range of reasonable professional assistance,'" *id.* (quoting *Strickland*, 466 U.S. at 689), and "the presumption that the challenged action might be sound trial strategy." *Id.* (citing *Higgins v. Cain*, 720 F.3d 255, 265 (5th Cir. 2013)) (quotation marks and ellipsis omitted).

Additionally, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). The

defendant must "(1) provide the name of the witness, (2) establish the witness was available to testify and would have done so, (3) submit a summary of the contents of witness's proposed testimony, and (4) show the testimony would have been favorable to a particular defense." *Delgado*, 2023 WL 2994128, at *3 (citing *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). "In other words, a movant must show there was a reasonable probability that the missing testimony would have altered the outcome of the trial." *Id.* (citing *Alexander v. McCotter*, 775 F.2d 595, 603 (5th Cir. 1985)).

To support his claim of deficient performance, Hankton attaches an affidavit from one his CJA Panel trial attorneys, Emily Ratner, who stated, among other things, that she "had no experience as a trial attorney" before Hankton's trial, she was surprised by Robinson's "central role" in the government's theory of the case, and she did not attempt to interview Frith "because his name was one of so many individuals who had some remote connection to various documents in the case that we could not determine his relevance, and by the time his name was contextualized during trial testimony we had no capacity to conduct investigation." Rec. Doc. 2379-1, pp. 55-58. Ms. Ratner also stated that she "recall[ed] growing pushback about our requests for funding and when trial began, it was unclear whether I would even be compensated for my time at a lawyer rate for the trial," and that there were "internal grumblings from the CJA panel that we were spending too much money on Telly Hankton's defense. This made it difficult to ask for more help and more resources as the case progressed." Rec. Doc. 2379-1, pp. 55-58.

The fact that Ms. Ratner was so quick to admit her own perceived shortcomings is unfortunate, especially considering that, after Hankton's trial concluded, she continued representing Hankton on appeal as a CJA-appointed attorney and requested considerable delays in the appellate process before withdrawing without filing a brief. *See Hankton*, Fifth Circuit

42

Case No. 16-30995, Doc. 375, pp. 1-2 (government's opposition to Ms. Ratner's motion to withdraw, stating, "Ordinarily, the United States Attorney's Office for the Eastern District of Louisiana does not oppose motions to withdraw, extension requests, or similar motions as a matter of professional courtesy. Because this appeal has been pending before this Court since September 2016 with no end in sight, the government is compelled to break from its standard practice."); Doc. 375, p. 2 ("Telly Hankton's current appellate counsel was also his attorney at trial, and she has had almost three years to work on the instant appeal."). However, Ms. Ratner was not the main attorney representing Hankton at trial. Instead, she was supervised by experienced criminal defense attorney D. Majeeda Snead. Hankton has not attached an affidavit from Ms. Snead, who presumably would disagree with the argument that she provided Hankton constitutionally ineffective assistance.

Hankton's attorneys' opinions in February 2024 notwithstanding, Hankton has not established any deficiencies with his representation. *Strickland* does not require attorneys "to investigate everyone whose name happens to be mentioned." *See Cockrell*, 720 F.2d at 1428. Ms. Snead may very well have made the sound strategic decision to focus her team's time and resources on other, more pressing witnesses than Robinson, whose shootings were not the subject of substantive counts, and Frith, who was inside a store and did not see the Bessie murder. *See Delgado*, 2023 WL 2994128, at *3 ("[A] movant's claim that his counsel provided ineffective assistance when he failed to call a witness is 'not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.'") (quoting *Woodfox*, 609 F.3d at 808); *Henry*, No. 08-19, 2010 WL 2998888, at *3; ("In evaluating counsel's performance, the

district court should make every effort to eliminate the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time of trial.").

Moreover, had Robinson testified, the jury would have learned that Robinson did not see the face of the person who shot him and that Robinson personally believed it was not Hankton because he, Hankton, and Brian Broussard were old friends.[16] But this testimony would have been contradicted by Latoya Stewart, who testified that Robinson told her that Hankton had shot him, *see* Rec. Doc. 1921, p. 130, and who testified that Hankton chased and shot Robinson months later. *See* Rec. Doc. 1921, p. 131-32. Robinson's failure to see who shot him would have been weighed against the testimony of Michael Anderson, who saw Hankton shoot Broussard and learned Robinson had been shot in 2004, Rec. Doc. 1922, pp. 73-74, and who also knew that Hankton associates later shot at Broussard and Robinson in 2005. *See* Rec. Doc. 1922, pp. 79-80; *see also* Rec. Doc. 1922, pp. 14-15 (testimony from NOPD officer about shooting).[17]

Additionally, Robinson's testimony would confirm Hankton and Broussard argued after Broussard sold heroin from the porch of Hankton's aunt's house, *see* Rec. Doc. 2379-2, pp. 6-7, thus, corroborating for the jury the "beef" at the center of the feud between Broussard, Robinson, and Hankton, and bolstering the evidence the government presented at trial. *See* Rec. Doc. 1921, pp. 122-32; Rec. Doc. 1922, pp. 64-77; *see also* Rec. Doc. 1920, pp. 61 (government's opening statement: "They defy Telly's orders to deal drugs elsewhere, resulting in this years-long beef

---

[16] The jury may also have learned that Robinson did not recognize Hankton's "walk"—a statement Robinson provided in his 2024 statement to § 2255 counsel, *see* Rec. Doc. 2379-1, pp. 69-70, but not in his 2016 statement to trial counsel. However, that testimony would have been challenged by Robinson's words from his 2016 statement: "In that situation, I wasn't really looking at the man." *See* Rec. Doc. 2379-1, p. 63.

[17] As quoted throughout this response, Judge Feldman found that "Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton." Rec. Doc. 1652, p. 30.

instituted by Telly Hankton, resulting in the 2004 shooting of Brian Broussard by Telly Hankton, the 2004 shooting of Rodney Robinson by Telly Hankton, the 2005 shooting of Brian Broussard and Darnell Stewart by associates of Telly Hankton[.]"). For these reasons, Hankton cannot demonstrate either deficient performance or prejudice in failing to present testimony from a witness who did not know who shot him but who would have confirmed the shooting's motive and corroborated other evidence of Hankton's guilt. This is especially true because, as stated above, the two Robinson shootings were only 2 of 101 overt acts alleged in the Count 1 RICO conspiracy. *See* Rec. Doc. 670, pp. 8-16. As Judge Feldman found, "At best, it is wishful thinking that a witness like Robinson would have saved Hankton from conviction." *See* Rec. Doc. 1652, p. 30.

Hankton's claims fare no better regarding Frith and the Bessie murder. Frith, in his February 2024 statement, did not claim to see who shot Bessie. *See* Rec. Doc. 2379-1, pp. 74-75. Instead, he stated he was inside a store when he heard gunshots, came out after the shooting was over, and heard other people's descriptions of the shooter's mask and the shooter's escape in a white Mitsubishi car. Rec. Doc. 2379-1, p. 74. This secondhand account of what other unnamed people claimed to see does not negate the testimony of Tilicuis Irvin and Isaac Skinner, who testified they saw Hankton shoot Bessie. *See* Rec. Doc. 1922, pp. 250-53 (Irvin); Rec. Doc. 1922, p. 202, 205-06 (Skinner); *see also* Rec. Doc. 1922, pp. 207-08 (Skinner explaining why he did not report the incident to police, saying, "Because I had just witnessed [Hankton] kill a man. I didn't want to be next."). Thus, even if Frith had been called as a witness, it would not have created "a reasonable probability that the missing testimony would have altered the outcome of the trial." *See Delgado*, 2023 WL 2994128, at *3. Hankton's claims that he received ineffective assistance of counsel do not satisfy the *Strickland* standard, and they should be denied.

**VII.   Hankton has not demonstrated that he is entitled to a new trial under the cumulative error doctrine.**

Hankton claims that the accumulation of his alleged "errors" requires that he be granted a new trial. Rec. Doc. 2379-1, p. 51. "The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Oti*, 872 F.3d 678, 690 n.10 (5th Cir. 2017) (quotation marks omitted); *see also United States v. Narang*, No. H-17-290-01, 2023 WL 5489055, at *9 (S.D. Tex. Aug. 24, 2023) (applying cumulative error doctrine in context of § 2255). "Cumulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness." *Oti*, 872 at 690 n.10 (quotation marks omitted). "The possibility of cumulative error is often acknowledged but practically never found persuasive." *Id.* (brackets omitted).

In this case, Hankton has not demonstrated that an accumulation of errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *See id.* Any errors Hankton has identified in his two-week trial are not of a magnitude that they require reversal. *See United States v. Gibson*, 875 F.3d 179, 199 (5th Cir. 2017) ("At most [the defendants] may have identified a harmless hearsay mistake. The cumulative error doctrine thus does not apply[.]"). Hankton's § 2255 motion should be denied.

**VIII.   This Court should deny Hankton's § 2255 motion without additional discovery or an evidentiary hearing.**

Finally, there is no need for an evidentiary hearing or further discovery because "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *See* 28 U.S.C. § 2255(b). "No hearing is required unless (1) the record, as supplemented by the trial judge's personal knowledge or recollection, does not conclusively negate the facts

46

alleged in support of the claim for § 2255 relief, and (2) the movant would be entitled to postconviction relief as a legal matter if his factual allegations were true." *United States v. McClinton*, 782 F. App'x 312, 314 (5th Cir. 2019). "'[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.'" *United States v. Olvera*, No. CIV.A. H-11-1740, 2013 WL 2289961, at *7 (S.D. Tex. May 22, 2013) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007)).

Additionally, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). "Section 2255 was not intended to permit endless litigation on matters already resolved, and for this reason, discovery is properly limited to resolving factual disputes which, if resolved in the movant's favor, would entitle him to relief." *Lincks v. United States*, No. 3:20-CV-1603-B (BT), 2021 WL 3828154, at *2 (N.D. Tex. Aug. 27, 2021) (citing *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000)), *aff'd*, 82 F.4th 325 (5th Cir. 2023); *see also* Rule 6 of the Rules Governing 28 U.S.C. § 2255 Proceedings. "Contentions that in the face of the record are wholly incredible will not entitle one to discovery or a hearing." *Id.* (citing *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996)) (quotation marks omitted). Hankton has not made the showing necessary for a hearing or discovery.

As argued above, many of Hankton's factual allegations, especially those involving *Brady* and *Napue* violations, are refuted by the record. His claims of ineffective assistance of counsel plainly fail to satisfy either prong of the *Strickland* standard. And, there is no free-standing claim of actual innocence that Hankton may present. *See Scruggs*, 691 F.3d at 671.

Hankton has not alleged facts that, if fully developed, would result in relief. Accordingly, he is not entitled to discovery or an evidentiary hearing.[18]

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Telly Hankton's § 2255 motion without discovery or an evidentiary hearing. *See* Rec. Doc. 2379.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY


*/s/ J. Ryan McLaren*
J. RYAN McLAREN (36577)
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3037


## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to ECF-registered counsel of record


*/s/ J. Ryan McLaren*
J. RYAN McLAREN
Assistant United States Attorney


---

[18] The only circumstance where an evidentiary hearing may be necessary would be if this Court disagrees with the government concerning the prejudice prong of Hankton's claims of ineffective assistance of counsel. In that scenario, before the Court rules on the deficiency prong, it may benefit from hearing testimony from Ms. Snead, who can explain the circumstances of Hankton's representation and whether certain challenged decisions were strategic. However, in the event the Court agrees with the government that Hankton cannot show prejudice, even assuming any deficiency, then a hearing would be unnecessary. *See Henry*, 2010 WL 2998888, at *3 ("If the Court finds that the petitioner has made an insufficient showing as to either prong, it may dispose of the claim without addressing the other prong.").